Curtis GRAVES et al.

v.

Ben BARNES et al.

Diana REGESTER et al.

v.

Bob BULLOCK et al.

Johnny MARRIOTT et al.

v.

Preston SMITH et al.

Van Henry ARCHER

v.

Preston SMITH et al.

Frank A. ESCALANTE et al.

v.

Mark WHITE et al.

James GASKIN et al.

v.

Mark WHITE et al.

Wanda L. CHAPMAN et al.

v.

Mark W. WHITE, Jr., et al.

Civ. A. Nos. A-71-CA 142 to A-71-CA-145, A-73-CA-115, A-73-CA-146, A-73-CA-155.

United States District Court, W. D. Texas, Austin Division.

Jan. 28, 1974.

Probable Jurisdiction Noted May 28, 1974.

See 94 S.Ct. 2601.

R. James George, Jr., Austin, Tex., Norman M. Bonner, Jr., Don Gladden, Forth Worth, Tex., J. Phillip Crawford, David R. Richards, Austin, Tex., George J. Korbel, San Antonio, Tex., for plaintiffs.

John L. Hill, Atty. Gen. of Tex., Austin, Tex., Elizabeth Levatino, Asst. Atty. Gen., for defendants.

Before GOLDBERG, Circuit Judge, and JUSTICE and WOOD, District Judges.

MEMORANDUM OPINION
AND ORDER

PER CURIAM:

On December 13, 1971, this three-judge court was convened pursuant to the order of Chief Judge Brown to hear four suits attacking the constitutionality of the state legislative redistricting plan adopted by the Texas legislature in 1971. The original complaints alleged: (1) racial gerrymandering in the establishment of the Harris County Senatorial districts; (2) excessive population disparities among the state's 101 House districts; and (3) invidious discrimination against certain racial and ethnic groups as a result of multi-member House districts in eleven counties.

In Graves v. Barnes, 343 F.Supp. 704 (W.D.Tex.1972), this Court upheld the validity of the Harris County Senatorial plan, found unconstitutionally high population variances in the House apportionment scheme, and ordered the implementation of single-member districts in Dallas and Bexar counties for the approaching 1972 elections. Though the plaintiffs did not withdraw their contentions concerning the unconstitutionality of the nine remaining multi-member districts in the Texas House of Representatives, under the press of time and by agreement of the parties [1], no testimony was offered on these districts at the initial trial.

In White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the United States Supreme Court reversed our holding that the population variances in the 1971 House plan violated the principle of "one man, one vote," but affirmed that portion of the decision requiring single-member districts in Dallas and Bexar Counties.[2] The Supreme Court then remanded this case "for further proceedings in conformity with the opinion of this Court." On this remand the original plaintiffs and unchallenged intervenors have presented evidence of the effect of the nine multi-member districts on minority access to the political process, requiring us once again to wander through the political thicket.

Since the time of our consideration of the House districts in Dallas and Bexar Counties, the decisions of the Supreme Court in *White* and of the Fifth Circuit Court of Appeals in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973), and Turner v. McKeithen, 490 F.2d 191 (5th Cir. 1973), have provided considerable instruction on the proper standards of judgment when multi-member districts are alleged to deny racial or ethnic minorities equal protection of the law by denying them equal access to the political process. *White*, read along with its antecedents, descendants, and collaterals, has scythed much underbrush from the jungle to be penetrated in reapportionment cases. This path-clearing has permitted us to chart our way more securely along constitutional ground. *White* reaffirmed the teaching of Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), that multi-member districts are not unconstitutional *per se* and emphasized that in order to show that multi-member districts have cancelled out or minimized minority voting strength, plaintiffs must

> produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the [racial or ethnic] group in question —that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice. 412 U.S. at 766, 93 S.Ct. at 2339.

But in upholding this court's finding of unconstitutional dilution in two multi-member districts, the Supreme Court was afforded the opportunity to indicate, in considerably greater detail than

1. Graves v. Barnes, *supra* at 718 n. 7.

2. The Supreme Court summarily affirmed our conclusion on the validity of the Senate plan in Archer v. Smith, 409 U.S. 808, 93 S. Ct. 62, 34 L.Ed.2d 68 (1972).

had been possible in *Whitcomb*, precisely what political and demographic factors would support a finding of insufficient access and would therefore justify the ordering of smaller single-member districts in which the concentrated racial or ethnic group would make up a greater percentage of the district population.

## I.

The Supreme Court first noted the political and social facts of life in Texas that this panel has found crucial to an understanding of the operation of multi-member districts in the state. Political access is not a vapid phrase confined within a rigid formula, but is frequently perpetuated by mores, folkways, and customs. In this area the Supreme Court has liberated us from any dichotomy of *de facto* and *de jure*. It is not necessary to establish that minority voters are being legally disenfranchised. We are permitted to explore the entire environment and to measure its political pollutants. Unlike Indiana, the state under consideration in *Whitcomb*, Texas has historically been a one-party state with a history pockmarked by a pattern of racial discrimination that has stunted the electoral and economic participation of the black and brown communities in the life of the state. The isolation of Mexican-Americans arising from such discrimination has been further exacerbated by cultural and language barriers. The all-white primary system, the poll tax, and the most restrictive voter registration procedures in the nation[3] have left behind them a pattern of political apathy that continues to inhibit the participation of minority groups in the political process. In addition, the current electoral system, while no longer marred by the flagrantly discriminatory practices of the past, retains many features that were found in the original proceedings to facilitate minority exclusion. Texas requires that a candidate garner a majority of the vote in a primary election in order to receive party nomination. The state legislative races in particular are marked by a requirement that candidates from a multi-member district run for a specific "place" on the ballot. Since there is no matching provision that these places correspond to particular sections of the district in which the candidate must reside, the rule serves no function but to reduce the election to a series of head-to-head contests with a consequent emphasis on the racial element where it appears. Nor does there exist any rational state policy explaining the present use of multi-member districts in any county.

Though these statewide conditions alone are not sufficient to demonstrate the invidious effect of multi-member districts in any particular county, they do provide a continuing background for specific findings on the positions of minority communities in the nine challenged districts. *White* and its progeny indicate that, given these general conditions, the plaintiffs' burden is satisfied by proof of the existence of an "aggregate of factors,"[4] including: (1) restricted access of minority groups to the slating of candidates for particular party nominations; (2) the consistent use of racist campaign tactics to defeat minority candidates or those championing minority concerns; (3) the indifference or hostility of the district-wide representatives to particularized minority interests; and (4) the inability of minority groups to obtain representation in proportion to their percentage of the district population. No one element is the *sine qua non* of a finding of denial of access; nor must all be present in any given county. In order for a court to grant the requested relief, however, a combination of these factors must have the effect of fencing the minority out. A court must be shown the wire and enough of the barbs to make for an effective barrier.

3. *See* Breare v. Smith, 321 F.Supp. 1100 (S.D.Tex.1971); Garza v. Smith, 320 F.Supp. 131 (W.D.Tex.1971).

4. Zimmer v. McKeithen, *supra*, 485 F.2d at 1305.

■ Mindful of these factors, and on the basis of an "intensely local appraisal" of the impact of multi-member districts in each county, we have determined that in seven of the nine challenged districts the present multi-member scheme operates to deny black and brown voters access to the political process. We have reviewed each county from a contemporary vista, while always remembering that our todays are the products of our yesterdays. Here as in many constitutional thickets it has been wisely said that a page of history is worth a volume of logic.

A. DISTRICT 59 (HIDALGO COUNTY)

Plaintiffs conceded at trial that they were unable to produce evidence to prove that the two-place multi-member district in Hidalgo County operates to deny any racial or ethnic group access to the political process. On the record before us, there is no basis for a holding that the present legislative plan for Hidalgo County violates the constitutional guarantee of equal protection of the laws.

B. DISTRICT 32 (TARRANT COUNTY)

District 32 is contained entirely within Tarrant County, and encompasses 147 and a fraction of Tarrant County's 161 census tracts. The total population of the district is 675,368, making it the largest remaining multi-member legislative district in the state; a delegation of nine represents District 32 in the House of Representatives.

The district's population is 82% white, 12% black, and 6% brown. The mean annual family income of the district is $11,296, and the mean family size is 3.8. Deviations from these means, however, are pronounced in many of the census tracts. Tract 106.02, for example, comprises 96 families with a mean family income of $40,693 annually and a mean family size too small to appear in available statistics. Nearly one-third of Tract 106.02's families have an annual income between $25,000 and $50,000, and nearly one-fourth enjoy annual incomes over $50,000; 98% of them are white. In Tract 54.02, 2,253 families have a mean annual family income of $26,825 and a mean family size of 2.61; there are no non-white families in the tract.

In contrast, the mean family income in Tract 11 is $4,437 annually and the mean family size is 4.62. Over one-third of the families in Tract 11 have annual incomes of less than $3,000. The population of that tract is 86% black, 10% brown, and 4% white. Families in Tract 17 have a mean annual income of $3,604 and a mean size of 4.56. Tract 17 residents are 95% black, 1% brown, and 4% white; a substantial majority of them receive incomes of less than $3,000 annually.

Twenty-five census tracts contain a population 30% or more black; thirteen are more than 75% black. Seven tracts have 30% or more Mexican-American residents. Thus, the black and brown populations of Tarrant County are, to a rather large extent, concentrated in identifiable geographic areas.

Tarrant County, like many Southern locations, has not historically been generous to its minority population. In the fifties, citizens' groups resisted the desegregation of formerly all-white neighborhoods and community facilities. School desegregation has been a continuing source of conflict; resistance to the implementation of court-ordered plans persists to the present. Recently, property owners and developers in affluent neighborhoods have endeavored to prevent the building of low-or moderate-priced housing in their areas; a group in the Richland Hills neighborhood has threatened to file suit in federal court to keep the area from getting "more than its share" of low-priced subsidized housing.[5] Suburban areas especially have discouraged black families from set-

5. Ft. Worth *Star-Telegram*, November 11, 1973, at 4–A, col. 1: "Suburbs Oppose Subsidized Housing".

tling, as evidenced by the recent unabashed public declaration of one outlying resident that people like his town because there are "no city taxes and no nigras".[6]

Racial discrimination is not confined to a vocal few. The evidence establishes, for instance, that black candidates who obtain the endorsement of the powerful labor-liberal coalition in Tarrant County are nevertheless doomed to failure because of the refusal of rank-and-file laborers to vote for a black, even a black endorsed by their unions' leaderships. Racial factors are important even in races between whites. A recent legislative candidate who trailed his opponent in the first primary overcame the opponent's lead in predominantly white areas and won the runoff after a hasty leafletting campaign designed to appeal to white voters' fears of "forced" busing to achieve school desegregation. In summary, District 32 and its environs has been no oasis in Texas' "colorful history of racial discrimination;" nor has recent progress healed the wounds of history. Black and brown citizens have been, and continue to be, victims of racial discrimination in Tarrant County.

In light of historical and continuing racism in District 32, it is not surprising that black and brown candidates for office have met with small success. Indeed, the outlook for black candidates was so generally bleak that no black ever ran for the legislature from District 32 until 1968. Since that time, three blacks have sought seats in the House of Representatives; none have been successful. Charles Grays sought the Democratic nomination (which is tantamount to election, since no Republican has ever represented District 32 in the House) in 1968. One of the important local factions, the labor-liberal-minority coalition, slated and endorsed Grays. He was told by the slate-makers, however, that he could not win and that they did not expect him to win; they placed him on the slate as token opposition to a strong incumbent and to attract black and brown votes for other slated candidates. He received less money from the coalition than other candidates on the slate and, as expected, lost—with an overwhelming majority of the black vote and a very small number of white votes.

Bobby Webber, a wealthy black businessman, ran for the Democratic nomination in 1972, with the endorsement of the labor-liberal coalition. Webber, however, was not a recruit of that coalition, and like Grays he received considerably less support—financial and otherwise—from the group than did white candidates. He financed his campaign primarily with funds he raised himself. Webber made an impressive showing in the primary, gained the runoff, and garnered about 46% of the vote. Several factors, however, suggest that his relative success is no sign that the voters of Tarrant County are prepared to elect a black to the legislature. Webber apparently eschewed television campaigning and concentrated his resources on newspaper advertising in an effort to leave many voters ignorant of his color. He spent nearly three times as much money in the campaign as his opponent, Tom Schieffer, a 24-year old white; Schieffer was not an incumbent. Webber took positions on major issues that were attractive to many white and middle-class voters. Despite these efforts, he was ultimately unsuccessful. He polled an enormous majority among black and brown voters but lost heavily in white areas. Rather than indicating that Tarrant County is a relatively promising environment for black aspirants to office, Webber's experience demonstrates that even a black with many advantages, much money, and an Anglicized image cannot succeed in an at-large legislative race in District 32.

The third black candidate to run during the years 1968–72 was Charles Gas-

6. Ft. Worth *Star-Telegram*, November 21, 1973, at 4–A, col. 8: "Economics Key to Suburban Housing for Minorities".

kins, a candidate in 1972. Gaskins was even less successful than Webber or Grays, in part because the black Precinct Workers Council did not endorse him and his opponent was well-known and popular. Like Webber and Grays, however, Gaskins made a much better showing in black and brown voting boxes than in predominantly white boxes.

Two brown candidates have in recent years sought the Democratic nomination for the legislative seat from District 32. Robert Ramirez offered himself on one occasion, and was placed on the labor-dominated slate. A Tarrant County labor leader testified that the labor group "supported him to help turn out the Chicano vote with the full knowledge that we didn't have a chance to win." On another occasion, the labor group refused to support Harold Valderas and endorsed his opponent George Richardson, because Richardson "has always been a good friend of organized labor". No Mexican-American candidate has ever been successful in securing a seat in the District 32 delegation.

The evidence shows that two organizations "slate" or endorse legislative and other candidates in Tarrant County, and that support by one group or the other is necessary to elect any candidate to the House of Representatives. No candidate in recent history has ever been sent to the House without identification with one of these two slates.[7] No witness disputed the existence of a labor-liberal minority coalition that regularly recruits, interviews and endorses candidates. There is some disagreement about the nature of the so-called "Seventh Street" group, reputedly a coalition of businessmen who recruit and support candidates on behalf of local business interests. Two experts who testified expressed the opinion that the Seventh Street group is a well-organized and powerful force in Tarrant County politics. A local politician, however, declared the Seventh Street group "mythical." Yet the degree to which the Fort Worth business community is an organized formal political council, as contrasted to a loose affinity grouping of individuals and institutions, is not the quantum of evidence required to support a conviction in a criminal conspiracy case. It is sufficient to observe that Fort Worth businessmen and mercantile institutions form a natural community of interests and that some of them lend their support—public or private, financial or moral—to individuals seeking office. The evidence is undisputed that at no time has the business community supported, collectively or otherwise, the candidacy of a black or brown person.

The impact of this dual slate-making process is significant. A Fort Worth labor leader, whose testimony was not controverted, stated that he and other labor leaders met with representatives of the business community in 1962 and agreed that neither group would endorse candidates who opposed the other group's favorites. In effect, each group "conceded" some races to the other. This incident speaks eloquently of the very real power of the business group as a political force as well as the impossibility of succeeding as a candidate in District 32 without the support of one group or the other.

The virtual political impotence of District 32's minorities has had several effects. Among the most important is the legislative delegation's lack of enthusiasm for initiating legislation fashioned for the "particularized needs" of blacks and browns in the district. Among the issues to which the delegation has displayed indifference are day-care, fair housing, civil rights, desegregation, job discrimination, prison reform, and welfare reform. Although many of the representatives voted for such measures as

7. Mrs. Betty Andujar was victorious in a Senate race recently, even though she appeared on neither slate, but she ran in a Senatorial district that includes only approximately half of representative district 32. Her case is exceptional in many respects: she ran as a Republican against a non-incumbent opponent, and she was a well-known figure in local politics as well as the wife of a prominent physician.

a bill giving an injured employee the right to be compensated for medical care by the physician of his choice and the open meetings law, there was testimony that neither issue was of particular moment to minority persons. It is likely that the delegation's support for these measures may be attributed to the allegiance that many of the representatives bear to the interests of organized labor. Although the delegation voted unanimously for a bilingual education bill and a bill permitting interracial child adoption, no District 32 member originated or worked actively for the passage of that legislation. A majority of the delegation voted for a city and state sales tax, a tax opposed by vocal minority organizations. One representative voted against the creation of a state holiday honoring Dr. Martin Luther King. The significant observation about the performance of the District 32 delegation, however, does not pertain to its votes on legislation that has already reached the voting stage; it is the consistent failure of the members to devote time and effort in bringing legislation that meets minority needs to the floor. One particularly striking example is the delegation's failure to prevent the closing of the Narcotics Addict Rehabilitation Administration facility in Fort Worth for lack of funds.

A second result of minority powerlessness in District 32 is a most subtle form of disenfranchisement: alienation.[8] Statistics comparing the participation of registered voters in selected predominantly black and predominantly white precincts reveal that in 1970, black turnout in primary elections was 28% compared to a white turnout of 38%; the percentages for the general election were 43% and 59% respectively. In 1972, 40% of black registered voters and 51% of white registered voters in those precincts participated in the primary; black turnout was 53% versus 70% of white voters in the general election. The effect of blacks' lower participation,[9] coupled with the fact that blacks also register in smaller proportions, creates an almost overwhelming handicap to a minority candidate or one who commits himself to the interests of minorities. Thus the process spirals endlessly. History and powerlessness create apathy and unresponsive representatives: unresponsiveness breeds more apathy, apathy more powerlessness and unresponsiveness. Not only those who do not learn from history, but also those who are trapped by history, are condemned to repeat it.

In Turner v. McKeithen, *supra*, the Fifth Circuit found the following factors "entitled to consideration" in declaring unconstitutional a multi-member district drawn for the election of a police jury in Quichita Parish, Louisiana: continuing effects of past discrimination on minority participation in political activity; opportunity for minority persons to participate in the selection of candidates; responsiveness of elected officials to the particularized needs of minority persons; and the strength or tenuousness of the state interest in preserving multi-member districts. In District 32, we find past discrimination and its vestiges exercising a continuing check on minority registration, voting, and candidacy. We find powerful interests "slating" candidates without consulting minority representatives and without reference to minority interests, and we find that a candidate not slated has vir-

8. A political expert long active in Tarrant County politics recounted an incident that occurred when she was working in a voter registration campaign. She offered to register an elderly black woman and the woman responded: "It doesn't make any difference whether I register or whether I vote. Those white people are going to do whatever they want to anyway. And they're going to elect whoever they want to." The woman's attitude apparently is shared by many members of the district's minority community, which both registers and votes in far smaller proportions than the white majority.

9. A Tarrant County political expert testified that the level of political participation there, especially registration and voting, is as low among browns as among blacks.

tually no hope of election. We find, in general, that delegations past and present have not demonstrated a commitment to the representation of minority interests. This lack of access to the political process is enhanced by the size of District 32, which is the largest remaining multi-member district in the state. The Fort Worth dual school system, like the one in Ouachita Parish, was abandoned only under court order, and school desegregation remains a controversy in Tarrant County generally. Just as no black has served on the Ouachita County Police Jury since Reconstruction, no black has represented District 32 in the Texas legislature. Moreover, in District 32 there is a clear pattern of "unresponsiveness," a finding that the court explicitly declined to make in *Turner*.

In Zimmer v. McKeithen, *supra*, the Fifth Circuit concluded that a finding that some minority group members had been elected to office does not foreclose the inquiry into other factors bearing on the constitutionality of the multi-member district. In District 32, of course, we have found, in addition to all other factors, that black and brown candidates have been unanimously unsuccessful. In summary, the plaintiffs have clearly proved that District 32 works unconstitutionally to "cancel and minimize" minority voting strength according to the standards in White v. Regester, *supra*, Zimmer v. McKeithen, *supra*, and Turner v. McKeithen, *supra*.

C. DISTRICT 7 (JEFFERSON COUNTY)

District 7, which contains 90% of the population of Jefferson County, sends a delegation of three members, elected district-wide, to the House of Representatives. The population of Jefferson County is 25% black and 4½% brown. Since the portions of the county excluded from the multi-member district are overwhelmingly white, blacks comprise approximately 30% of the district's population. This sizeable black community is largely concentrated in ghetto areas of Beaumont and Port Arthur, the two significant urban centers in the county.[10] No resident of these ghetto areas, indeed no black man or woman from any part of the district, has been elected to a district or county-wide office since the turn of the century.

We find that in the Jefferson County multi-member district virtually every element contributing to the dilution of the minority voice in representative government is present. Though all of Texas has to some degree suffered the blight of racial discrimination, the attempts of the black community in Jefferson County to eliminate the vestiges of slavery have been met by particular turbulence, animosity, and recalcitrance. In 1963, black citizens of Jefferson County were forced to resort to picket lines in order to obtain their children's admission to the municipally sanctioned Southeast Texas State Fair. Until that same date, the public libraries in the city of Beaumont were closed to black patrons. As late as 1967, the local newspapers continued to list available real estate according to the desired race of prospective buyers. It was only after passage of the Civil Rights Act of 1964 that blacks were employed by the Jefferson County government as anything other than janitors. The record sounds mere echoes from Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the rising decibels orchestrated by that case are barely audible in Jefferson County. Nearly twenty years after that historic decision the Beaumont Independent School District continues to operate seven all-black schools and persists in busing black children past neighborhood schools to attend all-black schools on the other side of town. Educational segregation is a factor in political isolation in the county.

10. The population of the district is 221,314. Beaumont has a population of 115,919 and Port Arthur 57,371, according to the 1970 census.

Of even greater significance to the political position of the black community has been the county's history of racial discrimination in employment and labor union activity. The Beaumont-Port Arthur area is heavily industrialized, with refineries and petro-chemical plants dominating the economic scene. Until the mid-1960's, the hiring and promotion practices of these plants were racially motivated, and blacks were relegated to menial positions. The union locals were also separated on the basis of race, and even after their merger, plant seniority reflected the dominant racial attitudes. The newly integrated black workers were placed at the bottom of the seniority ladder.

The gradual elimination of these segregated labor practices, frequently as the result of court orders [11], has brought with it an increasing degree of racial hostility in the community. This bitterness in the ranks of labor holds particular significance for the opportunity of blacks to participate in the current district-wide elections for state representatives. Jefferson is a one-party county. Any group desiring to have an impact on the political process must operate through the Democratic party machinery, and organized labor is the principal force in the county Democratic party. The endorsement of the local council of the Committee on Political Education (COPE) of the AFL–CIO has been characterized as "tantamount to election." The record shows that COPE-supported candidates have suffered defeat in county or district-wide elections only when extraordinary personality conflicts have divided the labor vote. Although the labor committee that passes on political candidates does not usually solicit people to run for office, it does interview those who have indicated a desire to run and then prepares a slate of candidates. No black man or woman has ever appeared on these slates. This neglect of nearly one-third of the constituency of the three-member district has not been accidental. When called upon to explain their lack of enthusiasm for black candidates, the local labor leaders reported to the State AFL–CIO and the local black community that they would not support a black because of the racial hostility of their predominantly white membership. There can be no doubt but that this marked opposition has both prevented black legislative victories and discouraged potential black candidates from entering the field.

The effect of white hostility on campaign strategies and voting practices has been well demonstrated on the three occasions when black candidates have run for county or district-wide offices. In 1964 and again in 1972, Al Price ran for the Democratic nomination for the Texas House. In both campaigns he received overwhelming support in the black community but lost the race due to strong opposition in the white sections of the district. Elmo Willard ran in 1966 for County Commissioner and went down to defeat as the result of startlingly similar voting patterns. Both campaigns were marked by the use of racist tactics in the white areas; the election of 1966 brought armed white deputy sheriffs to the polls in the black residential sections of the county.

Those candidates elected to the legislature from Jefferson County, while not in recent years openly hostile to the interests of the sizeable black community, have been both insensitive and unresponsive to the particularized needs of a segment of the population plagued by official and private discrimination. The District 7 representatives have had little contact with the political or social institutions of the black community. The State's one witness on District 7, Representative Terry Doyle, was entirely unaware of the degree of segregation in the Beaumont public schools.

In Dallas County this Court found that the multi-member district operated

11. *See, e. g.*, United States v. International Longshoremens' Ass'n, 334 F.Supp. 976 (S.D. Tex.1971).

to deny minorities access to the political process where the district-wide nominations were controlled by a single white-dominated organization, albeit an organization that occasionally sought out black candidates. In Jefferson County we are faced with no less determinative a slating body, which follows a demonstrable policy of avoiding input from the black community. In Dallas, minority access to the nomination and election of state representatives came as a matter of white largesse; but in Jefferson access comes not at all. We find that the creation of three single-member districts out of the present District 7 is essential to black participation in the nomination and election of state representatives.

D. DISTRICT 35 (McLENNAN COUNTY)

District 35 is coterminous with McLennan County, and includes the city of Waco as well as some rural areas. The district's population is 147,533 and two members represent it in the House of Representatives.

The Brazos River runs through Waco, dividing about one-sixth of the city from the remainder. Waco's black population is heavily concentrated in the small sector east of the river. Some neighborhoods immediately west of the river have also become predominately or heavily black in the last decade. The most central areas of the city contain the only substantial concentrations of Mexican-American population. Census figures for 1970 show that black citizens constitute approximately 20% of the population of the city of Waco and 16% of the county as a whole. Approximately 7% of the county's residents are Mexican-Americans. The percentage of blacks in various Waco census tracts ranges from zero to one hundred. Only nine of the thirty-two census tracts in the city of Waco have a black population greater than 5% but less than 60%; in other words, Waco neighborhoods, for the most part, are overwhelmingly white or predominantly black. (Residential figures for Mexican-American or Spanish-surname persons were not presented to the court.)

Waco's history of racial discrimination is no less blatant and pervasive than that of other areas in Texas. In a referendum in 1956, 81% of the voters in Waco expressed a preference that their school system remain segregated, and majorities almost as large voted for "specific legislation perfecting State Laws against intermarriage between white persons and negroes [sic]" and "the use of interposition to halt illegal federal encroachment." [12] In that same year, one of Waco's daily newspapers ran the following passage, not as a commentary, but rather as a straight news story about the state's efforts to enjoin the activities of the NAACP:

> The sworn testimony and evidence take NAACP completely out of the aspect of crusading zeal. Not without reason does News Columnist Landrum identify it as the National Association for the Agitation of Colored People.
>
> NAACP in the South does not represent a Negro movement. . . . practically every move to change the racial mores of the section has come

12. Waco *News-Citizen*, August 2, 1956, at 1: "Voters Demand Segregation." The doctrine of "interposition" was apparently the theoretical brainchild of a legislative advisory committee appointed by Governor Shivers in 1955 in the wake of Brown v. Board of Education. The committee's document recommended: "individual, personal rejection of compliance with what is merely the latest expression of judicial opinion; refusal by every individual to observe a judgment to which he was not a party . . ."; "official action or non-action, as the case may be of the Legislature, local, State and district officials, boards, bureaus, and departments . . . to maintain a dual school system as long as the people of this State and the local communities desire it"; and the adoption of a constitutional amendment to "halt illegal federal encroachment." Report of the Legal and Legislative Subcommittee of the Texas Advisory Committee on Segregation in the Public Schools, September 1, 1956 (available from Texas State Library Legislative Reference Division).

from the outside, has been directed from the outside and financed from the outside. . . . NAACP is wrong sociologically in its stand and its activities. In a free country, every person is as entitled to his personal prejudices as to his so-called civil rights.[13]

Uncontradicted evidence revealed a curious incident in Waco's political past: The Waco City Council elections were conducted by wards for the first time in 1948. In 1950, a black ran for the council from one of the wards and was nearly, but not quite, successful. Immediately after the new councilmen took office, they acted by resolution to change the council voting system back to at-large, in order to alleviate the threat of a black council member. This at-large system remains in effect.

Controversy over the desegregation of Waco schools has given rise to several rounds of litigation, one of which is still in the courts. There are a few black organizations in Waco, but they have not met with much success in influencing local politics. There was evidence that when Waco officials feel that they must consult representatives of the minority community on some issue, they choose a committee of hand-picked blacks whose views do not contrast strongly with the views of the dominant majority. In addition, indigenous black organizations are misquoted and misrepresented by the media, to the extent that their credibility among both their constituents and others is destroyed. In general, the climate in McLennan County is so unfriendly toward aggressive black political activity that the witnesses all agreed that the mood of black Waconans is one of despair, apathy, and discouragement.

McLennan County does not have groups that slate and sponsor candidates like the labor and business groups in Tarrant County. Yet as in Tarrant County, no black in McLennan has ever been successful in a bid for a legislative seat. Indeed, in McLennan no black has ever run for the legislature; one witness testified that none had ever even considered such a race. There have been two black city councilmen in the city's history, one of whom currently sits on the council. Black councilmen, however, apparently have not acted as effective spokesmen for black and minority interests. One of them was elected in a race against another black, and lost by a margin of three to one in black polling places but won heavily in white areas. Thus, he was elected by whites and owed a political debt to them, rather than to black people. Two Mexican-Americans have run for the council but neither was successful.[14]

Although there is no evidence that past McLennan County delegations have often voted contrary to the wishes of minority citizens, a former representative who supported the needs of the economically disadvantaged generally, testified that he could not recall any legislation aimed specifically at vindicating the interests of minority groups that he or other District 35 members had originated or carried. Thus the McLennan County delegation does not have a record of affirmative legislative initiatives on behalf of the particularized needs of minority persons in the district.

All of these factors—past history of discrimination resulting in continuing lack of minority political participation, demographic and geographic factors, the failure of the few bids of minority candidates, and the present representatives' lack of commitment to the particularized needs of minorities—present a persua-

13. Waco *News-Citizen*, October 25, 1956 at 7: "Texas Suit Uncovers NAACP."

14. The present at-large city council voting system retains the requirement that candidates for the various places must reside in particular wards. Thus, it is not surprising that one place on the council is often filled by a black. This is a further reason that the election of two blacks to the city council does not tend to show that a black could run successfully county-wide in the legislative district, since there is no residence requirement for holding a legislative seat.

sive pattern of cancellation and minimization of minority voting strength. The most striking element in McLennan County, however, is the absolute despair and apathy felt by most of the county's minority residents. There was testimony that blacks in particular vote in very small numbers, the single exception being races in which a black is a candidate. A former representative said: "It doesn't make any difference who runs, they feel they are not going to get much out of it one way or the other, so they just quit voting."

Thus we find that in District 35 all of the factors that persuaded the Fifth Circuit in *Zimmer* and *Turner* and the Supreme Court in *Regester* are present in full measure. The use of a multimember district in McLennan County operates to cancel or minimize minority voting strength and cannot survive constitutional attack.

E. DISTRICT 37 (TRAVIS COUNTY)

District 37 comprises all of Travis County. It has a population of some 300,000, of which 250,000 is contributed by the City of Austin, the State capital. Travis sends a delegation of four to the House of Representatives. The population of the county is approximately 20% brown and 12% black. Yet no black or Mexican-American has ever been elected to the Texas legislature from the Travis County multi-member district.

Travis County legislative electioneering is not controlled, as is the case in Tarrant and Jefferson counties, by one or two formal slate-making groups. However, the Democratic party is the one continuing and significant political force in the county,[15] and a coalition of Austin businessmen and state capitol lobbyists have generally controlled the local party mechanism. The black and Mexican-American minorities in the county are not represented in this dominant group. The leaders of the minority community are not consulted on the question of selection and support of particular candidates for the legislature, or any other offices. Indeed, the testimony indicated that the black community frequently learns of decisions on the upcoming elections from black waiters who serve at the meetings where such conclusions are reached or discussed.

This initial political isolation has been deepened by the geographic and social separation of the black and Mexican-American communities from the dominant Anglo section of the county. Nearly all minority residents in Austin live on the east side of Interstate Highway 35. The churches, civic clubs, athletic teams, and other social institutions of this area are almost entirely black or Mexican-American. Access to the social institutions of the Anglo community, which is crucial to the development of the information and contacts necessary for a political career in Travis County, is not available to the inhabitants of the ghettoes and barrios of Austin.

This pervasive isolation from the dominant community has affected not only the ultimate success of minority candidates at the polls, but also the willingness and opportunity of blacks and Mexican-Americans to offer themselves for public service. No black has ever sought the Democratic nomination for the legislature from Travis County, and only two Mexican-Americans have garnered sufficient financial and other support to attempt the race. Both of these efforts at minority participation in the elective process met with defeat despite overwhelming support from black and brown voters following campaigns marked by appeals to the racial fears and hostilities of the sizeable white majority. The same racially oriented tactics have been used in primary campaigns against those Anglo candidates thought to identify with minority interests. When minority candidates began

15. Although a single Anglo individual has twice in recent years been elected to the Texas House from Travis County on the Republican ticket, the present delegation is entirely Democratic and the Republican party does not function as a continuing, viable force in local politics.

to achieve some success in city elections in Austin for the school board and city council in the early 1950's, those bodies altered their election method. The procedure was changed from one in which all candidates ran city-wide, with those accumulating the highest totals winning election, to a place system with a majority vote requirement—a procedure identical to the present legislative scheme. This device operated to shut off serious black or brown challenges until the late 1960's. Although a black man currently serves on the Austin city council and a black woman occupies a place on the school board, both victories are more accurately attributed to the largesse of the Anglo community than to significant black participation in the political process.[16]

The representatives elected from the Travis County multi-member district, while not uniformly hostile to the particularized needs of minority residents, have evidenced an indifference to the serious problems confronting this constituency. This is especially significant in that one of the most pressing minority concerns, equal employment in the agencies of state government located in Austin, is peculiarly susceptible to amelioration by *state* representatives. But the only movement in this regard has come from minority representatives elected from single-member districts in other parts of the state.

We find that virtually every factor present in the Dallas and Bexar County multi-member districts is identifiable in District 37. There can be no justification for our holding acceptable in Travis that which was unconstitutional in districts to the north and south.

### F. DISTRICT 75 (LUBBOCK COUNTY)

District 75, which includes Lubbock County, has a population of approximately 147,722 people and sends two representatives to the House of Representatives. Approximately 7.4% of the county's population is black and approximately 17.33% is brown, making a total minority population of 24.73%. The bulk of the black and brown population resides in the northeast quadrant of the district, with a portion of the predominately brown population spilling over into the northwest quandrant and a portion of the predominantely black population extending into the southeast quandrant.

Formerly a small ranching town, Lubbock, the principal city located within District 75, exploded in a period of growth at the beginning of the twentieth century with the convergence of two groups. The first were Anglo cotton farmers, largely from East Texas, which introduced the Southern, rural culture. The second were the Mexican-Americans, who worked in railroad construction and maintenance until the development of cotton farming. As the cotton industry developed, the Mexican-Americans became the migratory field workers, coming first from New Mexico and Texas in the early 1900's, and coming again in later waves in the 1950's. With the growing mechanization of cotton farming in the 1950's and 1960's, the former migratory workers began to take up permanent residence in Lubbock. Thus, not unlike the blacks in the deep South, the Mexican-American in Lubbock County was received by most of the dominant Anglo population not as a fellow human being, but—in the words of one historian—as

> a species of farm implement that comes mysteriously and spontaneously into being coincident with the maturing of the cotton, that requires no upkeep or special consideration during the period of its usefulness, needs no protection from the elements, and

16. The city council victory is explained by the fact that the black candidate ran as part of a group endorsed by the dominant business community. The testimony of all those knowledgeable on Travis County politics indicated that the election of a black woman to the school board must be largely attributed to the fact that the election was held on the day following the assassination of Dr. Martin Luther King and therefore represented a certain distortion of ordinary voting patterns.

when the crop has been harvested, vanishes into the limbo of forgotten things—until the next harvest season rolls around.[17]

Blacks and browns residing in Lubbock County have long suffered from,[18] and continue to suffer from, the effects of racial discrimination. A dual school system, officially ignored until a 1970 federal court order, *see* United States v. Lubbock Independent School District, 316 F.Supp. 1310 (D.Tex.1970), coupled with the obvious language barrier, has made a significant impact on the education level of Mexican-Americans. Approximately 60% of the Mexican-Americans drop out of school before the eighth grade, and less than 10% finish high school. Although one-fourth of the public school students are brown, only about eighteen Mexican-American graduates of the Lubbock Independent School District have received a college degree, and fewer than .3% of the entire brown population in the county are college graduates. Since very few of the public school teachers are able to speak Spanish, the verbal testing used to classify students for Educational Mentally Retarded (EMR) classes is unreliable and a disproportionate number of Mexican-Americans are assigned to those classes. Although the speaking of Spanish on school grounds—forbidden until 1968—is now permitted, enthusiasm for bilingual education may be inadequate: the director of that program in the Lubbock Independent School District speaks no Spanish.

17. Kibbe, Latin Americans in Texas 176 (University of New Mexico Press, 1946), cited in Baird and Guzman, Mexican Americans in Lubbock: Political Subculture and Mexican American Political Behavior (unpublished portion of research project from Texas Tech University, Lubbock, Texas, presented at the 1973 Annual Meeting of the Rocky Mountain Political Science Association, Laramie, Wyoming, April 27, 1972).

18. For an excellent history of discrimination against Mexican Americans, see Tijerina, a History of the Mexican Americans in Lubbock County, Texas (thesis submitted in partial fulfillment of the requirements for a degree in Master of Arts at Texas Tech University, Lubbock, Texas, August, 1973). Tijerina notes that

> There were several factors which rendered the Mexican Americans more easily susceptible to categorization. For one, they all spoke Spanish at that time, and they were all of a different culture from the American. They tended to congregate exclusively among themselves, which seems to have been recognition of their lack of acceptance. Just as significant was the fact that Anglo Americans in the Southwest at the turn of the century had a strong tendency to consider themselves superior. Those in Lubbock were no exception, and although they were no more homogeneous than the people they called Mexican, they called themselves Anglo, as much a label of self-recognition as of exclusion. Another very probably though indirect factor in the segregation of the early Mexican American was that farmers in Lubbock needed a mobile, unstable cadre of field laborers for their great seasonal demand for labor. This necessitated a system which would keep the laborers mobile, but still not drive them away permanently.
>
> Although the early Mexican Americans failed to perceive any overt discrimination, their alienation was slowly developed by an incipient process in almost all aspects of their lives. Though they were served in restaurants, they knew that they could sit only at the rear of the building. Their children were not allowed in the town school which was giving the Anglo children an American education. They remained in cotton-picking work not because they had a natural propensity for life on the farm, as has been proposed, but because they were not accepted into other occupations in Lubbock. When the first Mexican Americans obtained work in Lubbock, it was restricted to the construction of sidewalks and brick streets. When the Lubbock Chamber of Commerce proudly enumerated the town's businesses in a 1916 promotional leaflet, not a single Mexican American establishment appeared on the list. It would be years, in fact, before the first Mexican Americans would become stable enough to accumulate the needed capital for their own places of business. Excluded as they were from the natural American socialization processes of an American education, social interaction on an equal basis, and acceptance as individuals into stabilized society, they and their children would continue for decades to live as aliens in their own land.

*Id.* at 37–39 [footnotes omitted].

Discrimination against Mexican-Americans in areas other than education continues. Browns were restricted to the balconies of motion picture theatres in the mid-1960's, refused admittance to public swimming pools as late as two years ago, and turned away from other public facilities as recently as last year. Moreover, the testimony was uncontradicted that from one-fourth to one-half of the Anglo population of Lubbock County still stereotypes the Mexican-American as lazy, emotional, and unmotivated.

The economically depressed Mexican-American population is largely confined to the north and northeast portions of the county. The median family income in this area is $3,500 per year lower than that in other areas of the county and over 28% of these families have income below the poverty level. The Mexican-American home in this section of the county is valued on the average at $6,766.00, compared with the county-wide average of $12,900.

Not unexpectedly, this pattern of pervasive racial discrimination and economic depression, particularly when it is imposed on a Mexican-American minority that constitutes only 17.33% of the county population, affords the brown population, as well as the 7.4% black population, little if any opportunity to participate in the political process leading to election of state legislators. Thus, no Mexican-American has ever run in any district-wide race, and the state's witness could recall only one Mexican-American who had ever been elected to public office in the last ten years—a constable in a Justice of the Peace precinct. Political awareness in the Mexican-American community is generally low; only 12% could name one of their state representatives, and only 4% could name their state senator. Although voter turnout recently has averaged more than 40% of those registered to vote, only 16.8% have ever attended a political meeting and only 11.3% have ever worked in a political campaign. Moreover, a former county Democratic chairman from Lubbock County (and the state's only witness to appear regarding this district) testified that at least 25% of the population in the district would vote against a Mexican-American solely on the basis of race. He further testified that he favored single-member districts in the school board elections, in order to give adequate representation to blacks and browns. Finally, when asked to comment regarding the various factors that contributed to the denial of an opportunity on the part of Mexican-Americans to participate in the political process, he affirmed that ethnic origin, education, and cost of running for office all operated to deny access to the political process. Dr. Charles Cotrell, a professor of political science who testified as an expert witness for the plaintiffs, concluded that

> The Lubbock County minority populations are . . . in a traditional posture. That is, they are almost totally quiescent. There is apparently a great deal of hopelessness and despair, a great deal of alienation reflected in the attitude studies . . . There is very little hope as far as any kind of real participation rate and participation in politics. You find, for example, very few active minority members in politics in Lubbock County.

Thus the nearly total lack of opportunity on the part of this small Mexican-American minority to participate in the political process is clear.

### G. DISTRICT 72 (EL PASO COUNTY)

District 72, which comprises most of El Paso County, has a population of approximately 297,770 people and sends four representatives to the House of Representatives. Approximately 56.87% of the county's population is brown and approximately 2.8% is black; the combined population is 59.67%. El Paso County is nestled in the western corner of Texas on the Mexican border and extends in a southeasterly direction along the Rio Grande River, much like a long tail. The greatest concentration of Mex-

ican-Americans lies in the southern portion of the county and follows the Mexican border from the top of the county southward to the tip of the county.

Often referred to as the barrio, this strip along the Rio Grande River contains slightly less than half the county's total population but almost two-thirds of the Mexican-American population. Over 80% of the people in the county who have never attended school reside in the barrio. The 1970 report by the United States Department of Health, Education, and Welfare reveals that El Paso County had made little progress in eliminating the dual school system. At the time of the report, over 60% of the Mexican-American public school students still attended racially identifiable schools—that is, schools with an excess of 90% black or brown population. This report further revealed that school board decisions regarding construction and renovation of facilities and the drawing of attendance zones had the effect of maintaining and promoting the dual system of education, and that in the few integrated schools, the introduction of so-called ability groupings and tracking practices had retained the effects of segregation. The report further noted that the school district had failed to actively recruit black and brown faculty and administrative personnel, with the result that of the 48 counselors employed by the district, only 4 were brown and none were black; that of the 27 librarians, none were black or brown; and that of the 62 principals, only 8 were brown and one was black. The curriculum emphasis varied, according to this report, from predominately Anglo to predominately Mexican-American schools, so that the former emphasized college preparation and the latter vocational training.

The barrio is an area of economic depression and substandard housing and plumbing facilities. Nearly twice as many families in the barrio, or approximately 24%, live below the poverty level as compared with the rest of El Paso County. Approximately 17% of the barrio housing units lack plumbing facilities, contrasted with approximately 2% for the rest of the county; and the value of the average barrio house is approximately $10,000—or about $3,000 less than the county-wide average.

*Although Mexican-Americans* constitute approximately 52% [19] of the county's population, this finding alone does not foreclose inquiry into other factors indicating that Mexican-Americans in District 72 have less opportunity than other residents in the district to participate in the political processes and to elect legislators of their choice.[20] First, Mexican-Americans constitute only between 20 to 38% of the registered voters; and of this number, only 35 to 50% actually vote. The low level of registration and turnout is due largely to the lingering intimidation of Mexican-Americans since repeal of the poll tax and restrictive registration measures, as well as to a language barrier that presents obvious communication problems. Moreover, intimidation of Mexican-Americans under law has been replaced with more subtle forms of demoralization. For example, during voter registration drives in the late 1960's, the county tax-assessor, although a Mexican-American himself, attempted to place unreasonable limits on the number of deputy-voter registrars and often refused persons access to the voter registration books. He also declined to accept voter registration cards unless they were mailed by the registrant or submitted personally by

19. The figure of 56.87% referred to earlier is adjusted to eliminate from consideration the estimated 5% Mexican population residing in El Paso County as permanent aliens.

20. Relying on the Supreme Court's affirmance of the district court's determination in White v. Regester, *supra*, that the voting strength of Mexican-Americans was diluted in Bexar County even though they constituted a majority of the population, the Fifth Circuit recently rejected a similar argument involving a rural parish of 12,884 people and a 58.7% black population. Zimmer v. McKeithen, *supra*.

the registrant. Thus, he rejected any submission, either by mail or by a deputy-voter registrar, of registration forms in bulk form. Furthermore, a number of large employers in the county denied voter registrars access to their employees, many of whom are Mexican-American, during lunch hours or other employee breaks.

Second, of the fifty different legislators elected in El Paso County since 1886, only four have been Mexican-Americans. Both the Republican and the Democratic County Chairman admitted that racism, particularly so-called "whisper campaigns," played a large part in the defeat of Mexican-American candidates. One of the state's witnesses, a Mexican-American active in El Paso political campaigns, testified that in his view racism had lessened but admitted that only last year in the race for mayor a Mexican-American lost to an Anglo because of a racially-based campaign. The Mexican-American was characterized as "un-American" by his opponent because of his participation in Chicano organizations such as the Mexican-American Youth Organization, an activist political group.

Third, although no slating process exists for legislative races, a very strong and successful slating process has operated for the at-large city elections for nearly twenty years and is responsible for the success of Mexican-American candidates at that level. This slating group, an informal group of businessmen, usually chooses one or two Mexican-Americans from the business community. The group has been very successful, losing only two races for mayor in the last twenty years. At the present, for example, the mayor, who is an Anglo and the owner of a major food chain, was elected on a slate with two Mexican-Americans—one a home developer and the other an insurance agent.

Fourth, none of the Mexican-Americans elected to public office, whether local or legislative, have lived in the barrio. For example, in a recent race for the State Senate, two Mexican-American candidates, both former state representatives, faced each other in the runoff for the senate seat. Both lived outside the barrio; and Tati Santiesteban, the winner, was endorsed by a previous incumbent, an Anglo, who chose not to run.

Fifth, the El Paso County delegation has not been responsive to the particularized needs of Mexican-Americans. A case in point is Frank Owen, a witness for the state, who was a State representative from 1950 to 1954 and State senator from 1954 through 1965. Owen testified that he actively sought the support of the Mexican-Americans in his races but voted against repeal of the poll tax. He further testified that, other than the teaching of Spanish in the lower grades in school, he could think of no legislation he proposed relating to the particularized needs of Mexican-Americans.

Finally, a candidate's campaign expenses in a county-wide or district-wide race in El Paso County are substantially higher than those for a race in the smaller, single-member districts, such as one of the County Commissioner's precincts. Unlike candidates for the legislature, candidates for one of the County Commissioner's seats have not, in the past, relied on expensive television coverage. This difference has probably contributed, at least in part, to the comparative success of Mexican-Americans in races for County Commissioner. While only four Mexican-Americans have been elected State representative, seventeen have been elected to the Commissioners' Court, the governing board of the county.

In view of these considerations, we are persuaded that the Mexican-Americans residing in District 72 have less opportunity than other residents in the district to participate in the political processes and to elect legislators of their choice.

H. DISTRICT 48 (NUECES COUNTY)

District 48, which encompasses most of Nueces County, has a population of approximately 220,056; the district elects three representatives to the House of Representatives. Approximately 43.-58% of the county's population is brown and approximately 4.6% is black; the total minority population is 48.22%. The bulk of the Mexican-American population is confined to the southwest portion of the district and to a corridor running in a northeasterly direction. Within Corpus Christi, the principal city in the district, this latter area is generally referred to simply as "the corridor".

Nearly a third of the families living in the corridor exists on a level of income below the poverty level, while only 7% of the families in the rest of the county live at the subpoverty level. Approximately 11% of the corridor homes lack some or all of the plumbing. The average value of a house in the corridor is approximately $7,000, or approximately $4,000 less than the county-wide average.

The education level of the corridor residents lags behind that of the residents of the other portions of the county. Although the corridor contains only approximately one-fourth of the persons 25 years of age or older, it contains 85½% of such persons who have completed no schooling whatsoever. Moreover, only approximately 3% of the persons living in the corridor have a college education, as compared with approximately 15% in other areas of the county. In Cisneros v. Corpus Christi Independent School District, 324 F.Supp. 599 (D.Tex.1970), affirmed in part, modified in part, and remanded, 467 F.2d 142 (5th Cir. 1972), the court held that Mexican-Americans constituted an identifiable ethnic class and that in the Corpus Christi Independent School District, located within Nueces County, Mexican-Americans were subjected to de jure and de facto segregation and a dual school system in violation of the Fourteenth Amendment. Specifically, the district court concluded that

> [the] dual school district has its real roots in the minds of men; that is, the failure of the school system to anticipate and correct the imbalancing that was developing. The court is of the firm opinion that administrative decisions by the school board in drawing boundaries, locating its new schools, building new schools and renovating old schools in the predominately Negro and Mexican parts of town, in providing an elastic and flexible subjective, transfer system that resulted in some Anglo children being allowed to avoid the ghetto, or "corridor" schools, by bussing [sic] some students, by providing one or more optional transfer zones which resulted in Anglos being able to avoid Negro and Mexican-American schools, not allowing Mexican-Americans or Negroes the option of going to Anglo schools, by spending extraordinarily large sums of money which resulted in intensifying and perpetuating a segregated dual school system, by assigning Negro and Mexican-American teachers in disparate ratios to these segregated schools, and further failing to employ sufficient number of Negro and Mexican-American school teachers, and failing to provide a majority-to-minority transfer rule, were, regardless of all explanations and regardless of all expressions of good intentions, calculated to, and did, maintain and promote a dual school system.

Cisneros v. Corpus Christi Independent School District, *supra,* 324 F.Supp. at 617–620.[21]

21. After remand to the district court, a different district judge, noting that no desegregation plan was yet in effect in the Corpus Christi Independent School District, considered plaintiffs' motion to provide transportation for those students electing to avail themselves of majority-to-minority transfers. Although the district court indicated some reluctance to grant the motion, it did so in order not to "seriously offend the sensitivity of the appellate judges." Cisneros v. Corpus Christi Independent School District, 350 F.Supp. 1241, 1242 (S.D.Tex.1972).

The United States Commission on Civil Rights in a study entitled "Mexican-Americans in the Public Schools of the Southwest," April 1971, reported that many Texas school boards, at the time of its report, refused to enforce the state compulsory attendance law against Mexican-American children in order to avoid forcing large numbers of them to attend school with Anglo students. One school authority in Nueces County was quoted as saying "The trustees say 'We have too many Mexicans [in school] now. Don't build up the Mexican enrollment.'" Accompanying this racial discrimination in education is a history of other forms of discrimination in Nueces County, including the refusal to sell homes to Mexican-Americans because of restrictive covenants, the maintenance of separate wards for Mexican-Americans in the hospitals, and the maintenance of separate record-keeping procedures for Mexican-Americans by the Corpus Christi Police Department and Department of Public Safety as well as the Department of Public Welfare.

As in our analysis of District 72, which comprises most of El Paso County, the finding that the total minority population in Nueces County is 48.22% and that since 1964, the Nueces County delegation to the House of Representatives has included at least one Mexican-American every term but one, does not foreclose our inquiry into other considerations indicating that Mexican-Americans, as well as blacks, have less opportunity than the other residents in the district to participate in the political processes and to elect legislators of their choice. One such consideration is the significant part played by racially motivated campaign tactics. In the early 1950's school board elections in Corpus Christi were conducted on a plurality basis, with "single shot" voting permitted. Under this system Mexican-Americans were able to elect one Mexican-American representative on the school board. Although the presence of one Mexican-American on the school board had been tolerated by the white majority for a number of years, the attempt by a second Mexican-American in 1952 to gain a seat on the board motivated racial opposition. One such group, calling themselves Friends of Our Public Schools, urged voters to consider that

> Now, and for many years past, our Latin American friends have had one of their own race on the School Board, —as is frankly agreed by all fair thinking people that they should have. However, this present Latin American member still has two (2) years to serve on his current term, and naturally it was the thought that our Latin American friends would make no attempt to put an additional member on the School Board at this time,—and certainly not for the specific purpose of attempting to defeat an experienced Anglo-American member for a second term. But such does not seem to be the case, for in the March 17th issue of the Latin-American publication "La Verdad" which designates itself as the official Organ of the GI Forum (headed by Dr. Hector P. Garcia) there appeared, on the first page of such publication, a strong endorsement of Oscar Phillips [a Mexican-American candidate] as a candidate for the School Board, imploring all Latin-Americans to cast a vote for him.
>
> We feel that it is most unfortunate when a few members of any race seek to gain, step by step, control of our public institutions, and especially such control of our free public schools.

Shortly after this attempt by the Mexican-American community to elect a second member of the School Board, the board changed the method of election to a majority place system.

Similar tactics have continued in recent years. In a 1962 election for Regents of Del Mar College, located in Nueces County, in which "single-shot" voting was still permitted, four former members of the Board of Regents circulated an advertisement purportedly to discourage racially motivated voting and urging voters to "vote like Americans".

Although the appeal is more clearly worded than the attempts of earlier years, the intent is clear:

> On Saturday we are to elect three Regents of Del Mar College. There are four candidates. Three of them are Anglos. The fourth is of Mexican ancestry. The three candidates who receive the most votes will be elected.
>
> * * * * * *
>
> [Single-shot voting] is un-American and un-Democratic. It is, in fact, self-imposed segregation. And Del-Mar College lead the way in desegregation in this area.
>
> This 'single-shotting' process, in use over a term of years, has culminated in political organization set up for the avowed purpose of electing citizens of Mexican descent to public office.
>
> Inevitably, this process, if continued, will pit race against race. Already some Anglo voters are retaliating for refusing to vote for any candidate who has a Latin name. * * *

Similarly subtle tactics were used in a Corpus Christi city council race in May 1971. The pending school desegregation case, *see* Cisneros v. Corpus Christi Independent School District, *supra,* which had heightened racial tension in the city, was used as a campaign ploy against certain Mexican-Americans. For example, a group styled the Concerned Neighbors, Inc., in a letter circulated prior to the city council election, noted with respect to one candidate that

> Dr. Hector Garcia has been vigorously campaigning for his nephew, J. A. "Tony" Canalas, the People's Party candidate for Place 6. As you will recall, in the first hearing held before Judge Seals, Dr. Garcia testified in support of the Plaintiffs, and against the School District in support of the proposition of bussing [sic] of the school children across the district.

A second consideration in determining lack of access to the political process is the extent to which Mexican-Americans in Nueces County have been denied input to the legislative process, as distinguished from the electoral process. Thus, although the Nueces County delegation to the House of Representatives has included at least one Mexican-American in every term but one since 1964, this electoral success does not reflect a comparable legislative success in terms of response to the particularized needs of Mexican-Americans. Carlos F. Truan, a Mexican-American who was elected State representative in 1968 and re-elected in 1970 and 1972, testified that although he proposed legislation of specific interest to Mexican-Americans, it was necessary that he dilute much of his input on behalf of Mexican-Americans in order to accommodate the opposition of other constituents. As Representative Truan put it, "I think it [single member districts] would allow for representatives like myself that have specific interests in helping people that are less fortunate than others attend to those needs without having to dilute my attention and my time among so many other areas to take away from the specific problems I feel so strongly about that need to be solved in this state." Moreover, Representative Truan noted that although other members of his delegation, as well as other representatives from other parts of the state, vote in favor of certain proposals of significance to Mexican-Americans and may on occasion even propose such legislation as an original sponsor, they will normally lack empathy with the Mexican-American:

> You can't really appreciate the value of bilingual education unless you have been physically abused for speaking a language that your parents have spoken.
>
> You can't fully appreciate not having food on the table unless you have had that experience. And so if you have an opportunity to push for legislation creating the food stamp program state-wide, you are going to push for that specific legislation.

Finally, the evidence disclosed that Representative Truan lost much of his prior support in the election of 1972 because of Anglo resentment stemming from his

legislative proposals relating to the interests of Mexican-Americans.

Thus Nueces County Mexican-Americans are presently, and have been in the past, the victims of intensely bitter, racially motivated campaign strategy. These tactics are prompted by the substantial threat posed to certain Anglo political organizations by a near-majority Mexican American community with relatively good voter registration and turnout. When this strategy is not successful, the Mexican-American who is successful in a district-wide race must dilute his support of legislative measures of particular interest to Mexican-Americans and run the risk of losing reelection as a result of any such measures which he does support. The result is that the Mexican-American minority population in District 48 have less opportunity than other residents in the district to participate in the political processes and to elect legislators of their choice.

I. DISTRICT 19 (GALVESTON COUNTY)

Galveston County, containing the cities of Galveston and Texas City, constituted a two-member legislative district through the 1960's. The plaintiffs do not contend that the existence of a multi-member district presently denies, or has in the past denied, minority citizens of Galveston County access to the political process. The 1970 census revealed, however, that the population of the county was approximately 20,000 in excess of the number that constitutes an ideal two-member district; and the plan adopted by the Legislative Redistricting Board in 1971 removed 20,000 Galveston residents from multi-member District 19 and placed them in District 17, a flotorial district including all of Chambers County and portions of Harris County. With respect to the reallocation of these 20,000 citizens, the plaintiffs allege that the Redistricting Board plan was "gerrymandered" so as to remove Galveston County census tract 1219 from the Galveston County district and place it in the flotorial district, in order to minimize the voting strength of approximately 5500 blacks who reside in that tract.

If this claim is supported by the evidence, there is no doubt that the court may order appropriate relief. Whatever the law may be with respect to politically motivated gerrymandering to insure the election of persons of a particular political party, gerrymandering for the purpose of minimizing the political and voting power of blacks is in violation of the fifteenth amendment. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Taylor v. Board of Education, 294 F.2d 36 (2d Cir. 1961); United States v. State of Texas, 321 F.Supp. 1043, 1051–1052 (E.D.Tex.1970); Sims v. Baggett, 247 F.Supp. 96, 104–105 (M.D.Ala.1965). The court has considered carefully the evidence submitted by the plaintiffs with respect to their claim and has concluded that Galveston County and flotorial District 17 have been unconstitutionally gerrymandered in an attempt to minimize the voting power of blacks in Census Tract 1219.

District 17 is perhaps not so uncouth in appearance as was the city of Tuskegee, Alabama, immediately prior to Gomillion v. Lightfoot, *supra*. It does however, have its peculiarities. It includes Chambers County and portions of Harris County roughly north of Galveston County, but rather than claiming the northern-most census tracts of Galveston County (all of which are predominantly white), it curls down into Texas City and gathers five urban census tracts as well as the Bolivar Peninsula. In five of the Galveston County tracts chosen for inclusion in District 17, there are a total of 17 blacks. In the sixth, Tract 1219, there are 5500 blacks who live in the very center of Texas City. Tract 1219 is the source of much of the leadership of the black community in Galveston County. Yet at present those 5500 black voters must vote (or run) for the legislature in District 17, in which blacks constitute less than 8% of the population,

rather than with the remainder of Galveston County.[22]

The only testimony before the court regarding the intention of the Legislative Redistricting Board in designing District 17 was that of a current member of the legislative delegation from Galveston County, Representative Ed Harris. He testified that Tract 1219 was removed intentionally to thwart the growth of black political strength in that neighborhood.[23] Although the court has some reservations about accepting the opinion of one expert as a basis for its finding, the evidence already described lends circumstantial support to his conclusion. Moreover, the defendants made no attempt to impeach his testimony or to offer any evidence of their own suggesting some more permissible rationale for the district's composition. Accordingly, the court finds that the design of District 17 constitutes an impermissible racial gerrymander pursuant to Gomillion v. Lightfoot, *supra,* and works a deprivation of the constitutional rights of the black residents of Census Tract 1219.

## II.

Certain plaintiffs have requested award of attorney's fees in this case. Although the defendants are contesting the appropriateness of such an award, they have stipulated with certain parties as to the reasonableness of submitted schedules of fees and expenses. Other parties requesting attorneys' fees who indicated they would enter into similar stipulations with the defendants, however, have not yet done so.

The court is, of course, operating under a time constraint since the deadline for filing for legislative races is impending. Accordingly, the court has decided to render a final decision on the major issue before it at this time and to dispose of the matter of attorneys' fees at a later time when all of the necessary evidence is available. The court explicitly finds that there is no just reason for delaying the entry of today's order, but rather every reason to make the instant judgment final and appealable with respect to all of the issues considered herein. Accordingly, the court expressly directs the entry of judgment herein pursuant to Federal Rule of Civil Procedure 54(b).

## III.

## CONCLUSION

It has been nearly a century since the enactment of the Fourteenth and Fifteenth Amendments and still we hear cries of anguish calling for more tomorrows and mananas before the enforcement of these electoral constitutional mandates. The State implores that in the event we find the present multimember scheme unconstitutional, the legislature be permitted time to draw the new boundaries. We have given serious consideration to the alternative, but have concluded that the compelling constitutional infirmities present in seven of these districts and the considerable time delay necessary for any legislative action require that we adopt single-member district plans for the upcoming 1974 elections. *See* Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971); Swann v. Adams, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966); Graves v. Barnes, 343 F.Supp. 704, 736 (W.D.Tex.1972), aff. sub nom., White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

The legislature initially considered redistricting in 1971. The original opinion of this court, indicating the criteria by which the state's multi-member districts

22. The county's black population is approximately 33,314, or about 20% of the total.

23. Representative Harris further testified that the Galveston County delegation proposed a plan that would have drawn a group of 20,000 Galveston County residents reflecting the ethnic composition of the county as a whole for inclusion in another district. The delegation submitted the plan to the Legislative Redistricting Board, but the Board rejected it in favor of the current plan.

were to be judged, was issued in January of 1972. The testimony before us indicates that subsequent efforts at adopting a statewide system of single-member districts were blocked by the actions of some current representatives from the present multi-member districts, aided by sentiment that the legislature could simply sit back and "let the federal courts do it." Were we to stay our hand now, single-member districts would not be implemented before the 1976 elections. The black and Mexican-American minorities in the seven counties would remain fenced out of the state political processes for another three years. Not until January of 1977 would a legislature elected under an entirely constitutional plan convene. Six years would have passed since the state began its task of constitutional redistricting. We do not believe that legislative redistricting should be subject to perhaps a decade of deliberation with a minimum of mobility.

Therefore, with reluctance, but with a firm conviction that such action is necessary for the vindication of constitutional rights, we adopt the plans appended to this opinion.[24] In line with the procedure followed in the original order in this case, the equities of transition dictate that during the election to the Texas House of Representatives to be held during 1974 no candidate in Districts 7, 32, 35, 37, 48, 72 and 75 shall be required to reside in the single-member district that he or she seeks to represent. The enforcement of the provision of the Texas Constitution requiring such residence will be enjoined for that year. The candidates must, of course, be residents of the present multi-member district from which the smaller districts have been carved.

In view of the time constraint upon the court and the complexity of remodelling such a house of cards as the districting scheme in and around Galveston County, the court declines at this time to issue injunctive or other affirmative relief in favor of the plaintiffs with respect to Districts 17 and 19. Instead, the court hereby declares that the present plan is unconstitutional and cannot stand, with every confidence that the legislature will undertake to remedy the constitutional deficiencies at the earliest possible date. Should the legislature fail to act before July 1, 1975, however, this court will be required to grant affirmative relief.

We emphasize that the holding of unconstitutionality in the Galveston area districting is limited to the racially motivated removal of Census Tract 1219 from the Galveston County district. The plaintiffs do not contend that the multi-member scheme in Galveston dilutes the black vote, and the legislature is under no constitutional obligation, of course, to divide Galveston County into single-member districts.

We do not believe that the forest has been trackless, and at the end of the trail we hope that we have come to a clearing, in order to observe the rays of a true democratic society. Without the opportunity of minority groups to express their political preferences, hopes, and aspirations, democracy would become perverted into a majoritarian totalitarianism. Our founding fathers were conscious that a majoritarian government must guarantee the minority access to the political process. The circulatory system of our democratic society cannot tolerate an ethnic embolism.

JOHN H. WOOD, Jr., District Judge (dissenting).

Forewarned, but undaunted by our original judicial foray into the political jungle two years ago in Graves v. Barnes, 343 F.Supp. 704 (W.D.Tex. 1972), the majority of this Court again sallies forth on another legislative reapportionment expedition. Contrary to my

24. In adopting these plans for seven multi-member districts the Court has disturbed none of the boundaries between those districts and adjoining single-member districts established by the Texas Legislature.

fellow travelers on the Panel, I do not find the scythe of the recent jurisprudence adequate to cleave a path through a myriad of thorny legal precepts. Initially, it may have been a relatively easy search to find a clearing in Dallas and Bexar Counties. However, the remaining multimember districts are shrouded, submerged and enveloped in cultural chasms, demographic densities, torrents of sociological theory and political pitfalls. The once simplistic course toward the goal of "one man, one vote" now appears as elusive as the source of the Nile.

With the exception of Hidalgo County, where it is conceded by all parties that constitutional standards are satisfied, I respectfully dissent to the Opinion of the Court.

In light of the Supreme Court's Opinion in White v. Register et al., 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, affirming in effect my dissent therein, I am of the mind that the instant case to a large degree merely asserts the same objections initially raised by the plaintiffs and that my original dissent is more appropriate now than it was two years ago. For these reasons and in the interest of brevity, I hereby incorporate for the purposes of this dissent my Opinion filed in *White*, supra.

Because I believe the majority of this Court to have strayed so far afield from the spirit and letter of the Supreme Court's decision governing reapportionment in Whitcomb v. Chavis, 1971, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363, it is essential to set out certain of those pertinent guidelines at this juncture. At the outset, the challenger must carry the burden of proving that multimember districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements (*Whitcomb*, at page 144, 91 S.Ct. 1858). The plaintiffs, therefore, must scale the bulwark of presumed constitutionality of the State's legislative scheme for it is clear beyond dispute that multimember districts are not *per se* unconstitutional, nor is their use in conjunction with single member districts impermissible (*Whitcomb*, at page 142, 91 S.Ct. 1858).

So much of this record is replete with opinion and conjecture that multimember districts are the root of all political ills allegedly suffered by the plaintiffs and that the only effective poultice is single member reapportionment. This Court does not sit as a body of political scientists weighing the efficacy of varying theories of political representation. In fact, such a practice is specifically condemned under *Whitcomb*. Further, the Supreme Court has declared that multimember districts may be suspect or subject to challenge only under a very limited criteria. Chances of a successful attack on such districts is further lessened where the district is small and does not comprise a substantial portion of the total legislative seats. (*Whitcomb*, at pages 143, 144, 91 S.Ct. 1858) The Court acknowledged, therefore, that there are significant differences between extremely large multimember districts, such as Tarrant County with approximately 675,000 residents with nine legislative seats and those small multimember districts at the opposite end of the spectrum.[1]

1. Proximate population and legislative seats for the remaining Counties at issue are as follows:

| | Population | Representatives |
|---|---|---|
| Dist. 72 (El Paso) | 297,000 | 4 |
| Dist. 37 (Travis) | 290,000 | 4 |
| Dist. 48 (Nueces) | 234,000 | 3 |
| Dist. 7 (Jefferson) | 221,000 | 3 |
| Dist. 19 (Galveston) | 150,000 | 2 |
| Dist. 59 (Hidalgo) | 150,000 | 2 |
| Dist. 75 (Lubbock) | 149,000 | 2 |
| Dist. 35 (McLennan) | 147,000 | 2 |

Having thus examined the general admonitions of the Supreme Court concerning reapportionment, it is essential to consider the more specific guidelines from which the majority of this Panel have further departed. In *Whitcomb*, supra, as well as *White*, supra, the criteria and burden of the plaintiffs is to:

> " . . . produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." (*White*, supra, 412 U.S. at page 766, 93 S.Ct. at page 2339.)

In applying this standard, *Whitcomb*, supra, specifies that Courts should take special note of districts where the minority is not allowed (1) to register or vote, (2) to choose the political party they desire to support, (3) to participate in the affairs of the political party they desire to support, (4) to be equally represented on those occasions when legislative candidates are chosen by the party they choose to support, or (5) are regularly excluded from the slates of both major parties, thus denying them the chance of occupying legislative seats.

The Supreme Court in *White*, supra, set out the additional requirement that the Court must consider the continuing effects of past discrimination on the minority group's ability to participate in the political process as a factor in the aggregation of circumstances indicating vote dilution.

The constitutional barometer in these cases is not calibrated by actual victory at the polls, but is rather based on concepts of equity and fairness where minority candidates and party members have at least a *chance* of winning or significantly influencing intraparty fights and issue-oriented elections. (*Whitcomb*, 403 U.S. at page 159, 91 S.Ct. 1858)

In addition, the Supreme Court declared that plaintiffs must show intent by the State to adopt a multimember district scheme which was conceived or operated as purposeful devices to further racial or economic discrimination or designed to dilute the vote of minorities. (*Whitcomb*, supra, at page 149, 91 S.Ct. 1858)

Furthermore, Justice White concludes in *Whitcomb*, supra, that there must be an effective remedy available which will alleviate the problems found in an unconstitutional multimember district. The Court in *Whitcomb* notes on pages 160 and 161, 91 S.Ct. on page 1878:

> "Moreover, if the problems of multi-member districts are unbearable or even unconstitutional it is not at all clear that the remedy is a single member district system with its lines carefully drawn to ensure representation to sizeable racial, ethnic, economic, or religious groups and with its own capacity for overrepresenting and underrepresenting parties and interests and even for permitting a minority of the voters to control the legislature and government of a State."
>
> * * * * * *
>
> "The remedial powers of an equity court must be adequate to the task, but they are not unlimited."

Not only must there be an equitable remedy at law, but the Supreme Court has gone one step further in *Whitcomb*, supra, by requiring the Court to explore and fashion where possible a less burdensome plan than ordering an entire single member district reapportionment. Commenting on the District Courts' failure to consider such alternatives, Justice White stated in *Whitcomb* at page 160, 91 S.Ct. at page 1878:

> "The Court entered judgment without expressly putting aside on supportable grounds the alternative of creating single-member districts in the ghetto and leaving the district otherwise intact, as well as the possibility that the Fourteenth Amendment could be satisfied by the simple re-

quirement that some of the at-large candidates each year must reside in the ghetto."

In essence, the Supreme Court has recognized that there must be some element of intent by the State, substantiated by factual findings, of minority political disenfranchisement or vote dilution with an available and effective remedy before a Three Judge Court may order reapportionment of State legislative districts.

It is especially interesting to examine those factors which may not be considered or are irrelevant and immaterial to a consideration of the multimember district dilemma. First, the fact that the number of ghetto residents who were legislators was not in proportion to ghetto population does not prove discrimination absent evidence that such residents lacked participation in the political process. (*Whitcomb*, p. 149, 91 S.Ct. 1858) Second, the fact that each member of a bloc-voting delegation has more influence than legislators from single member districts is not a compelling reason to redraw multimember districts absent a finding that such representatives counted for more in the legislature than did representatives from single member districts. (*Whitcomb*, page 147, 91 S.Ct. 1858) Third, where minorities or ghetto residents have equal access to the political process, the fact that their candidates are defeated at the polls does not mandate a finding against multimember districts. (*Whitcomb*, page 153, 91 S.Ct. 1858) Fourth, it is not a denial of equal protection to deny legislative seats to losing candidates, even in those so-called "safe" districts where the same party wins year after year providing there was effective access to the political process. The mere fact that one interest group finds itself outvoted and without legislative seats of its own is no basis for invoking constitutional remedies. (*Whitcomb*, pages 154, 155, 91 S.Ct. 1858) Fifth, it is not sufficient to claim that the ghetto's or minority's special interests were not heeded by the multimember delegation or that they were underrepresented absent their own legislative voice to further their own policy views without proof that the outcome would have been different if the representatives had been chosen from single member districts. (*Whitcomb*, page 155, 91 S.Ct. 1858) Sixth, the fact that one group with distinctive interests must be represented in the legislature if it is numerous enough to command at least one seat, and represents a majority living in an area sufficiently compact to constitute a single member district, is rejected as grounds for redistricting in *Whitcomb* at page 156, 91 S.Ct. 1858.

Turning now to the majority opinion and the cases relied upon therein from the Fifth Circuit Court of Appeals,[8] it becomes apparent that the Court has seriously eroded the "*Whitcomb* test" governing reapportionment and has improperly considered or failed to consider certain of the Supreme Court mandates set out herein.

The majority of this Panel declares *ab initio* that "the Supreme Court has liberated us from any dichotomy of de facto and de jure". (Majority Opinion, page 643) My reading of *White* and *Whitcomb* is to the contrary. It has been conceded that in *White* the Supreme Court added another dimension to the totality of circumstances which must be considered in these cases—that of cultural incompatability combined with the continuing effects of past discrimination and treatment against minorities. However, it is imperative to note that *White* also stressed the history of *official* racial discrimination in Texas, citing instances where Texas law had instituted or fostered majority vote in primary elections, the so-called "place" rule and voter registration procedures which, while not improper *per se*, had nevertheless operated to enhance racial discrimi-

8. Zimmer v. McKeithen, 485 F.2d 1297 (Fifth Cir., 1973); Turner v. McKeithen, 490 F.2d 191 (Fifth Cir., 1973).

nation. This is intentional State action pure and simple and as such amounts to an affirmance of the de jure concept. Justice White citing from the Graves v. Barnes opinion declared that the Mexican-American in Bexar County was denied political access when cultural incompatibility *was conjoined* with the poll tax and the most restrictive voter registration procedures in the nation to dilute the Chicano vote. (*White*, supra, 412 U.S. at page 768, 93 S.Ct. 2332) Again, the Supreme Court reiterates that there must be State action coupled with other circumstances before dismantling of multimember districts is required.

The specific language of *Whitcomb*, supra, cited in this dissent further corroborates the necessity for a de jure finding in the following passage:

> "But there is no suggestion here that Marion County's multi-member district, or similar districts throughout the State, were *conceived* or *operated* as *purposeful devices to further racial or economic discrimination.* As plaintiffs concede, 'there was no basis for asserting that the legislative districts in Indiana were *designed* to dilute the vote of minorities.'" (Emphasis added) (*Whitcomb*, 403 U.S. at page 149, 91 S.Ct. at page 1872)

In light of these clear and unequivocal statements in both *Whitcomb* and *White*, a finding by the majority of this Court that they have been somehow "liberated" from the de facto-de jure dichotomy is wholly without foundation. To find the unshackled freedom to dispense with the specific mandates of the Supreme Court is surely to rely on gossamer, even diaphanous, interpretations which I am unable to perceive under any construction of these two opinions.

The majority refers to their concept of the *sine qua non* of reapportionment in the following language:

> "No one element is a *sine qua non* of a finding of denial of access; nor must all be present in any given County . . . ; however, a combination of these factors must have the effect of fencing the minority out."

I find this at odds with the relevant case law. My reading of *Whitcomb* and *White*, supra, indicates that the *sine qua non* can be distilled into the following conjunctive and trinary elements without too much over-simplification: (1) that the sovereign State of Texas *"conceived or operated"* its nine multimember districts as *"purposeful* devices to further racial or economic discrimination . . . *designed* to dilute the vote of minorities"; and (2) that the "de jure" plans accomplish the purpose and intent of the State of Texas and in fact did dilute and cancel out the voting rights of minorities and prevent effective access to the political process; and (3) single member districts as distinguished from multimember districts, pluralitarian or other plans, would either solve or tend to solve these problems since it is academic that the law will not undertake a useless thing and impose a plan which does not offer a remedy.

Just as in many other areas of law and especially in the Civil Rights field where State action is involved by virtue of legislation, policy, practice or procedure, the Supreme Court has held legislative or de jure intent is an essential element to be proven prior to Federal Court intervention. This has been recently borne out in school desegregation litigation in Keyes v. Denver Independent School District (1973), 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548, and further relied upon in my Opinion in Morales et al. v. Shannon et al., 366 F.Supp. 813 (1973, W.D.Tex.) It appears beyond dispute, therefore, that the "de jure-de facto" dichotomy remains an important legal concept which is clearly applicable and reasonable to State action in legislative reapportionment cases.

The County-by-County analysis of the evidence discussed in this dissent will show unquestionably that any history of past discrimination in those Counties has been rendered impotent by minority

political activity at least the last decade. There is also an absolute dearth of evidence indicating that Texas election laws or procedures or any other State action, either overtly or covertly, were designed or operate to dilute the minority vote. The Majority Opinion goes on to find also that the "place system" rule "serves no function but to reduce the election to a series of head-to-head contests with a consequent emphasis on the racial element where it appears" (Majority Opinion, page 643) and that the State has no rational policy explaining the use of any multimember districts. (Majority Opinion, page 643) My perusal of the record, depositions and evidence discloses little, if any, mention of the "place system" either pro or con, nor was any testimony elicited concerning the State's policy for the adoption of multimember districts at the turn of the century. The burden is on the plaintiffs to come forward with tangible proof of a discriminatory "place system" or of an irrational State policy. This is not a fit subject for judicial notice.

Summarizing the "aggregate of factors" to be considered by the Court, the Majority relies on the paraphrasing of these precepts in the Fifth Circuit Opinions in *Zimmer* and *Turner*, supra. Obviously, a side-by-side analysis of *Whitcomb* and *White*, on the one hand, and *Zimmer* and *Turner*, on the other, amply demonstrates the whittling down of Supreme Court guidelines at the hands of master craftsmen. In *Zimmer*, there is no mention of *State action or intent*, no requirement that the Court consider viable alternatives prior to single member reapportionment and no mention that there must be an effective remedy as equity law requires prior to dismantling multimember districts. Having seemingly deleted these factors, the Majority adds several of their own to take up the slack. Unfortunately, the additions are specifically excluded under *Whitcomb* as pointed out herein. "Indifference or hostility of the district-wide representatives to particularized minority interests" and "the inability of minority groups to obtain representation in proportion to their percentage of district population" are condemned by *Whitcomb*, 403 U.S. on pages 155 and 149, 91 S.Ct. 1858, respectively, absent specific findings of a denial of political access.

While the foregoing analysis of *Whitcomb* and *White* may perhaps be a needless repetition or restatement of the language and principles enunciated by the Supreme Court, I am of the opinion that a specific listing of all factors comprising minority vote dilution as well as all factors which may not be considered by this Court under those rulings has been essential. My purpose in this endeavor is twofold. First, a cursory reading of the numerous guidelines and admonitions digested from lengthy opinions indicates the complexity of the redistricting problem and the multi-faceted viewpoint from which a Court must judge the virtues of a political scheme. To state that the light of truth emanating from the "burning bush", since *White, Zimmer* and *Turner* is now there for all to see, does not comport with the limited vision of this field so often admitted by the parties' counsel and Courts, and ignores the trepidation of the Supreme Court itself in ever entering this political thicket. Secondly, I feel my Brothers on the majority of this Panel have either oversimplified the problem and solution, or else have failed to consider much of what I deem important, if not imperative, in the Supreme Court mandate in reaching their decision and that it is the responsibility of the dissent to respectfully illustrate these differences of opinion.

The succeeding portions of this dissent will focus on a County-by-County analysis of the facts, testimony and evidence in an effort to show that the existing multimember scheme is not infirm nor is it in need of redistricting by the Court now or by the legislature pursuant to judicial order.

DISTRICT 32: TARRANT COUNTY

As stated in the majority opinion, Tarrant County comprises District 32

with a population of approximately 675,368. Of this figure, the ethnic breakdown indicates 82% of the County is White, 12% Black, and 6% Brown. The Court has made a thorough analysis of the economic, demographic and residential patterns in the various Census Tracts, and it is conceded that there exists a ghetto area of heavy Black concentration in the County. There are also allegations in the record of past discriminatory attitudes on the part of members of the Anglo community especially as regards residential and educational policies and practices.

The similarities found by the Court in Tarrant County when compared to those made by the District Court in Marion County, Indiana are striking indeed. Like Tarrant, the plaintiffs of Marion County alleged and the Court found that residents of the ghetto area had particular demographic characteristics rendering them cognizable as a minority interest group with distinctive interests. (*Whitcomb*, supra, 403 U.S. p. 129, 91 S.Ct. 1858) It was further concluded that "the mechanism of political party organization and the influence of party chairmen in nominating candidates were additional factors alleged to frustrate the exercise of power by residents of the ghetto area." (*Whitcomb*, supra, p. 129, 91 S.Ct. p. 1862) The Three Judge Court in *Whitcomb* also found: "Strong differences . . . in terms of housing conditions, income and educational levels, rates of unemployment, juvenile crime, and welfare assistance." That Court went on to find that the ghetto area suffered from "gross inequity of representation, as determined by residence of legislators" and "characterized Marion County's general assembly delegation as tending to coalesce and take common positions on proposed legislation" which obviated ". . . representation of a substantial, though minority, interest group". (*Whitcomb*, supra, p. 133, 91 S.Ct. p. 1864)

It is important to note the Supreme Court's summation and conclusory comments on these findings in Whitcomb v. Chavis, supra, pages 148, 149, 91 S.Ct. page 1871:

> "The Court identified an area of the city as a ghetto, found it predominately inhabited by poor Negroes with distinctive substantive-law interests and thought this group unconstitutionally underrepresented because the proportion of legislators with residences in the ghetto elected from 1960 to 1968 was less than the ghetto's proportion of the population, less than the proportion of legislators elected from . . . a less populous district, and less than the ghetto would likely have elected had the county consisted of single-member districts. We find major deficiencies in this approach."

Throughout *Whitcomb*, the Supreme Court struck down as inapplicable to the central issue most of the District Court's findings enumerated above. They held that proportionate numbers of legislators, block voting of delegations, unresponsiveness to the ghetto's particularized legislative needs were improper criteria for reapportionment absent findings that single member districts would cure those problems and a definitive showing that Negroes were not allowed to register to vote, choose their political party, participate in its affairs and to be considered or represented in the candidate choosing process. It must also be shown that ghetto residents were excluded from the slates of major parties.

Much of the findings made under the majority opinion parallel those made by the District Court in *Whitcomb* which were distinguished or declared inapposite with more compelling criteria. As concerns the majority's evaluation of the political structure, it is further apparent that the facts are susceptible to varying interpretations. To find, for instance, that Black candidates are doomed to failure regardless of an endorsement *vel non* of the labor-liberal coalition is not a finding of non-access to the political process by minority voters. Rather, this is an attempt to indicate vote dilution by

failure at the polls. What more can an endorsing group do than endorse? If Union members choose to ignore the endorsement by their leadership, can this be characterized as denial of political access to minorities? I think not. The majority goes on to illustrate their point by stating that a leaflet campaign concerning student bussing issues was a racial tactic employed in races between Whites. Granted, bussing by its very definition, focuses on race, but to imply that it is an unpopular topic solely in the White community or that, as an issue between two White candidates demonstrates undertones of racial bigotry, is simply without basis in fact or reason and ignores the national poll results showing conclusively that bussing is unpopular within all groups of American society. Furthermore, it is no indication of minimization or cancellation of minority voting strength.

As concerns the slating of Black candidates, several evidentiary facts must be considered. The deposition of plaintiff's witness, Mr. Joyce Wendell Sifford, indicates that the Tarrant County Central Labor Council is the political slating arm of organized labor which is aware of and relies upon the Black community to vote for and support their candidates. Labor supported a Black candidate in 1968, but denied endorsement to Mr. R. C. Johnson, a Black legislative candidate in 1970. In 1972, the Labor Council combined with other political organizations to screen party nominees. Among those groups, it is interesting to note that PASO, a Mexican-American organization, and the Precinct Workers Council, a Black organization, where included. These political groups endorsed Mr. Bobby Webber, a Black, among others though his race was not targeted as one likely to win.

The majority opinion describes Mr. Webber as a wealthy businessman who spent much time, money and effort in an unsuccessful bid for a legislative seat. Mr. Webber apparently attempted to escape any racial bias which might hurt him by not appearing on television and by advocating popular White issues. While these facts are no doubt true, it should be remembered that Mr. Webber placed second in the primary race against three White opponents. He garnered approximately 46–47% of the vote. In a County of 12% Blacks and a total of 18% minority population, it needs only simple mathematics to realize that Mr. Webber was not only a popular candidate, but also one who had very substantial Anglo support. To imply that the White community was totally ignorant of Mr. Webber's race does the Tarrant County news media and electorate a disservice. Mr. Webber's political career amply illustrates an active and effective participation and access by minorities in the County and his legislative race cannot and should not be easily discounted.

Charles Gaskins, a Black candidate, ran unsuccessfully for office in 1972. He failed to gain the endorsement of the Precinct Workers Council which apparently opted for nonendorsement of his race or else supported his well-known and popular White opponent.

Noteworthy also in Mr. Sifford's testimony was the fact that Black candidates have been chosen and have run on the Republican ticket for legislative seats in Tarrant County. It might be stated that the Republican Party has only elected one office holder—State Senator, Mrs. Betty Andujar—in Tarrant County in the Party's recent history.

Though no Blacks have been politically victorious, it is difficult to conceive of their denial to intraparty politics in either party in the selection of candidates or their endorsement or as official party workers at the precinct level and elsewhere. Testimony concerning the so-called "Seventh Street Group" is conflicting at best. No witness was able to identify a single member of the group except to say it was a business oriented, conservative political organization. No one knew of any time, or any place, where the group allegedly convened and in fact Representative Gibson Lewis de-

scribed it as "mythical". Lewis stated he'd never been approached by such a group, solicited funds from them, nor seen a slate card. Lewis also testified that in his political experience there was no group of "kingmakers" in Tarrant County, but rather that the political arena was a free-for-all evidenced by the election of Senator Andujar—a non-endorsed, female Republican. When questioned about voter apathy, Lewis remarked that voters, regardless of race or political ideology, simply lacked interest in the State Legislature and ofttimes show their ignorance of his own political office by asking, "Why aren't you in Washington?" He was of the opinion that single member districts would not change this attitude.

The majority of this Panel goes into some detail in an effort to prove the Tarrant County delegation unresponsive to minority interests. Of course, responsiveness to particular interest groups is not a criteria under *Whitcomb* as long as there is effective political access by that group. Nevertheless, it should be pointed out that most of the Tarrant County delegation voted for an "open meeting" bill, bi-lingual education, posting of prices for prescription drugs (introduced by Mr. Leland, a Black representative), licensing requirements for child care centers, and a crime and narcotics educational program. (See Lewis deposition, pages 192–199) Obviously, these legislative enactments have appeal to minority interests as well as to Tarrant County as a whole. There was no evidence analyzing the entire history of the last legislative session, but a cursory glance does not indicate the "indifference" to ethnic interests by the delegation of which they are accused in the majority opinion. The racial connotation in the statement that one legislator voted against the creation of a State holiday honoring Dr. Martin Luther King pales by the fact that he favored instead a holiday in memory of Lyndon Baines Johnson, President of the United States from Texas.

It should be noted that the Supreme Court had before it in *Whitcomb* a multimember legislative district of over twice the relative size and strength as the one now before this Court in Tarrant County (Marion County, Indiana—15 legislators of a total of 100, or 15%; Tarrant County, Texas—9 legislators of a total of 150, or 6%).

A multimember district which is "large and elects a substantial proportion of the seats in either house of a bicameral legislature . . . ", Whitcomb v. Chavis, supra, page 143, 91 S.Ct. page 1869, is more susceptible to successful challenge by virtue of its size. However, though the size of the challenged district may lighten the plaintiffs' burden somewhat, they must still prove "that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements." Whitcomb v. Chavis, supra, page 144, 91 S.Ct. page 1869.

Rather than to preponderate in favor of plaintiffs' burden in their challenge to District 32, the evidence shows the minority has had effective access to the political process. As with Marion County, Indiana (see Whitcomb v. Chavis, supra) there has been a showing in Tarrant County of a well defined ghetto area. There has been a showing that residents of this area are numerous enough to be entitled to at least one legislator if the area were segregated into a single member district; and there has been proof offered to show that the number of ghetto residents of Tarrant County who have been elected to the legislature is not in proportion to ghetto population. No showing has been made, however, that the minority has not been allowed to register to vote, or vote, to choose a political party, and to participate in its affairs. No showing has been made that the minority has been excluded from slate-making and other candidate selection processes. (In fact, some of the slate-making groups whose endorsements are sought and thought important are minority groups.) Plain-

tiffs have failed to carry their burden to show that the multimember district operates to deny effective access to or anything less than full participation in the political process in District 32. The only substantiable finding that can be made is that, having full access to the political process, the minority has been relatively unsuccessful at the polls. Such lack of success is not sufficient to support a finding of invidious discrimination. See Whitcomb v. Chavis, supra, pages 159–160, 91 S.Ct. 1858.

DISTRICT 7: JEFFERSON COUNTY

District 7, located within Jefferson County, is a multimember district containing approximately 221,000 population electing a three member legislative delegation. Approximately 30% of the district is Black.

While it is relatively undisputed that there has been an aura of racially motivated discrimination in Jefferson County, particularly as regards, and perhaps even limited to, the operation of area labor unions, the plaintiffs have not carried their burden of showing by a preponderance of the evidence that such discrimination has motivated the operation of the small multimember district in such a way as to deny the Black minority effective access to the political process.

Blacks have been elected on a district-wide basis to City Council positions in both Beaumont and Port Arthur (the two major population centers of the County). Blacks have also been elected to the Port Arthur and South Park School Boards.

The one example used by Dr. Cotrell to show the relative isolation and political ineffectiveness of the Black community is the legislative race undertaken by a Black, Al Price. A significant point overlooked by Dr. Cotrell, however, is that the disparity between the first three candidates ranged from approximately 9,600 for the first place candidate to approximately 7,200 for the third place candidate, Mr. Price. While second or third place in a primary election is not a victory, neither is it, in such a close race, evidence of political impotence and, as the Supreme Court has said in Whitcomb v. Chavis, supra:

> "The chance of winning or significantly influencing intraparty fights and issue-oriented elections has seemed to some (as discussed herein supra) inadequate protection to minorities, political, racial, or economic; rather, their voice, it is said, should also be heard in the legislative forum where public policy is finally fashioned. In our view, however, experience and insight have not yet demonstrated that multi-member districts are inherently invidious and violative of the Fourteenth Amendment."

The most significant political force in the County as regards any slating activity is the Labor Council. Mr. Price, in his attempt in 1970, gained acceptance as one of the three permissible candidates. Such endorsement is admittedly a significant achievement in Jefferson County (testimony of Dr. Charles Cotrell, Trial Transcript, page 645). However, such endorsement is not an absolute guarantee of victory, nor is failure to gain it the precursor of frustration and defeat. Messrs. Doyle and Powers were victorious without it.

As has been conceded herein, there has been an aura of racial discrimination in Jefferson County in the past, particularly as regards the operation of local labor unions. At the deposition of Cleveland Nisby of Beaumont, it was stipulated by plaintiffs' counsel, Mr. Richards, that none of these conditions would have been changed by single member districts in Jefferson County. In other words, single member districts will not correct these conditions.

In addition, it must be recalled that District 7 is a small three member district. Even if the Supreme Court mandate to be "color blind" in fashioning a single member district were to be overlooked and a "safe" district were drawn, it is inconceivable that the Black minori-

ty would be better served by perhaps one lone voice in the 150 man State Legislature.

The increasing political activity of the minority community combined with the lack of evidence to the contrary confirm a finding that the plaintiffs have failed to carry their burden in challenging the existing multimember district. Plaintiffs have, in effect, admitted that a change to a single member district plan might very well achieve nothing.

DISTRICT 35: McLENNAN COUNTY

District 35, encompassing all of McLennan County, has a population of approximately 147,500 and elects a two man multimember delegation to the Legislature. Of the total population, 16% (approximately 25,600) are Black and 7% (approximately 10,300) are Mexican-American.

As the minority points out, there is a geographically defined Black community in Waco, the major city in the County, representing approximately 20% of that city's population.

It is conceded that a racially biased attitude has existed in McLennan County in the past. Whether that attitude has motivated the operation of the existing multimember legislative district in such a way as to deny the racial minority effective access to the political process is *not*, however, conceded. It is on this pivotal point that I disagree with the majority. Plaintiff's burden is to show more than a history of racially biased attitudes in District 35.

One instance cited by the majority opinion which could be characterized as motivated to deny the Black minority equal access to the political process is related to the City Council election process. In 1948, Waco City Council elections were held for the first time on a ward, or single member district basis. In 1950, a Black ran for the City Council from one of the wards and fell only slightly short of victory. The newly elected Council, acting by resolution, changed the voting system back to the old at-large one which remains in effect at present. Such action is indeed curious. It is, however, equally curious to note, as the majority points out, that the present at-large system incorporates use of a geographic place system; that is, candidates for various places must reside in geographically defined wards. Such a system is seriously deficient if the desired result was to deny minorities effective access to the political process. This geographic place system is one of the alternative remedies recommended by the Supreme Court in Whitcomb v. Chavis, supra, at page 160, 91 S.Ct. 1858. Indeed, in 1970 a Black was elected to the City Council and another currently serves on it.

In spite of such evidence, the majority takes the position that institution of this system, which has produced two Black City Councilmen in the last two elections, is "curious" on the one hand and ample evidence of the desirability of single member districts on the other.

The majority, faced with such a factual setting, attempts to negate and weaken it by commenting that "Black councilmen, however, apparently have not acted as effective spokesmen for black and minority interests." The majority further seeks to dilute the significance of these election results by observing that one of the Black Councilmen was elected in a race against another Black, losing by approximately three to one in Black polling places and winning in White areas. Thus, it is concluded he was elected by Whites and owed them a political debt and was, therefore, not an effective representative for his fellow minority group members. The fact is, however, that in that race a Black candidate received a substantial vote from the White electorate. This race represented not a Black/White racial voting pattern, but more probably the liberal/conservative competition referred to by the witness, Tom Moore, Jr., infra.

The testimony of plaintiffs' witness, Robert L. Gilbert, a Black active in McLennan County politics, indicates that there is a healthy atmosphere of differing political views in the Black commu-

nity. Mr. Gilbert testified that in the recent school cases the NAACP issued a statement favoring neighborhood schools.[3] He pointed out that that organization and the Black Federation were split over the neighborhood school concept as well as along political lines generally. (Deposition of Robert L. Gilbert)

It is conceded by the majority that there is no evidence that the legislative delegation from District 35 has been unresponsive to the particularized needs of the minorities. Even if such showing were dispositive of the issues herein, or even of great moment, the plaintiffs have failed on this point. Plaintiffs have presented no evidence that minorities in McLennan County have been denied effective access to the political process.

Further, in the opinion of Tom Moore, Jr., a defense witness who served in the Legislature from District 35 until 1972 and classifies himself as a liberal, the strength and political effectiveness of the Black minority in McLennan County rests in its position as a swing vote in close elections. In Mr. Moore's opinion, the division in the County is much more appropriately described as one along traditional liberal/conservative lines than along Black/White lines. Further, in Mr. Moore's opinion, a division of the present two man multimember district into single member districts could result in polarization of this liberal/conservative split to such a degree that the delegation would present no unified front and would lose much of its present effectiveness. The plaintiffs stipulate that the voting record of Tom Moore, Jr. while he was in the Legislature was excellent. (Moore deposition, page 16)

The clear evidence is that, amid an atmosphere of racial bias on the part of some in the County, the minorities have not been denied the right to register to vote, vote, or run for political office. (There is no slating of candidates. See Majority Opinion.) Nor have minorities been excluded from participating in the inner workings of the Democratic Party (the only effective political party in McLennan County as in so much of the State). In fact, Blacks participate fully in the Democratic Party holding many of the precinct positions. (Deposition of Tom Moore, Jr.)

Again, plaintiffs have attempted to carry their burden of proof by reference to past attitudes of racial bias in the challenged district. Plaintiffs have failed utterly to meet the tests of Whitcomb v. Chavis, supra.

DISTRICT 37: TRAVIS COUNTY

The district encompasses the entire County, having a population of approximately 300,000 and electing a four-member delegation to the Legislature. The minority population of the district, located primarily in what is called East Austin, comprises approximately 32% of the total population (20% Mexican-American, 12% Black).

The only witnesses who could be categorized as political experts on the district were Mr. Frank L. Wright, who helped organize and has served as Chairman of the West Austin Democrats, and Representative Sarah Weddington.

Mr. Wright acknowledged being characterized as a liberal (Trial Transcript, page 709). He was, as said, a prime organizer of the West Austin Democrats, a geographical political action group, and has helped organize and has worked with several other such geographical political action groups (Trial Transcript, page 708). In addition, he has done considerable work with various Black and Mexican-American groups, his own theory being the time honored one that the most effective political force is well organized grass roots activity. In his view, the Blacks and Mexican-Americans are currently weakened by a growing internal bifurcation resulting from in-

3. This fact coalesces with the indications of nationwide poll data on the question of busing v. the neighborhood school previously referred to in this dissent.

creasing pressures for shifts in leadership and direction. Such continuing division has had a significant effect on the lack of numerous candidates from these communities. "One is that the community itself, . . . and I'm speaking really in general about both, have remained so divided and up in pieces that they did not tend to think of exerting themselves toward candidacy." (Trial Transcript, page 712) Mr. Wright further feels that it is no longer impossible for a Black or Mexican-American to win in the present at-large multimember district (Trial Transcript, page 717). Indeed, Mr. Berl Handcox, a Black, has won election twice and is currently serving on the Austin City Council and a Black woman serves on the School Board. In addition, there is currently a Mexican-American serving as one of the four County Commissioners. In recent years, a Mr. Garcia ran for the School Board and a Mr. Ruiz made the run-off against another liberal candidate in one of the State Legislature races. Mr. Gonzalo Barrientos, running against a fourteen year incumbent, came within 1,000 votes of winning out of 80,000 votes cast. Furthermore, the evidence fails to establish the existence of significant slate-making groups in this district. Indeed, many of those that do exist are in the minority community. In addition to these efforts, the minorities have been successful in directly gaining access to the workings of the Democratic Party, the most consistently potent political force in the district, by securing several party offices.

All of the above demonstrates the great degree of increasing political activism and awareness and the effectiveness of the minorities' access to the political process in District 37.

Representative Sarah Weddington, who won election in 1972 and is generally characterized a liberal, testified that she actively campaigned in and sought the support of the minority communities in District 37. She expressed concern that she cannot give the attention to minority needs she feels she should. A close appraisal of her testimony reveals that rather than out of fear of alienating some other part of her constituency by giving close attention to the particularized needs of her minority constituency, her difficulties arise from the same problem plaguing all other legislators—the voluminous workload of the Legislature (Trial Transcript, pages 503–505). In addition, Ms. Weddington testified that the other members of the District 37 delegation feel a definite commitment to the needs of the minority community (Trial Transcript, page 510).

When met with the direct question of whether the minorities in District 37 have, by use of the multimember district system, been denied equal access to the political process, Ms. Weddington responded in the affirmative. Her reasons, however, were that, given well drawn single member districts, they would have a better chance of electing one of their own. Again, as previously stated, the ability to win is not the criteria determining effective access to the political process. While Ms. Weddington's reasons may be persuasive conclusions, they are not controlling in light of the Supreme Court's opinion in Whitcomb v. Chavis, supra.

The overwhelming weight of the credible evidence preponderates in favor of defendants in District 37. No evidence has been presented to show that the minorities in District 37 are denied effective access to the political process. They register to vote, vote, influence their legislators, run for political office, and win. Indeed, for this Court to blindfold itself to the clear mandates and guidelines of the Supreme Court and require a restructuring into single member districts might well frustrate and defeat the significant political impact currently displayed by the minority communities.

DISTRICT 75: LUBBOCK COUNTY

The next challenge on our tour finds us in District 75, which includes Lubbock County and has an approximate population of 147,000 served by a two-

man multimember delegation. The total minority population of the district is approximately 36,000 or less than half of an ideal single member legislative district of 75,000 population.

While the majority opinion dwells almost exclusively on evidence of past and recent discrimination in the public school system and other public facilities and on the socio-economic condition of the Mexican-American minority in Lubbock County, little, if any, evidence is shown in the record, and none is referred to by the majority, which indicates that the minority in District 75 has been prevented effective access to the political process. Plaintiffs have sought to carry the burden of their challenge by a showing of past discrimination in areas other than access to the political process.

That few minority members have sought or been elected to office in the district is not determinative of the issue. See Whitcomb v. Chavis, supra, pages 148, 149, 91 S.Ct. 1858. As has been said, winning is not the equivalent of political access. Whitcomb v. Chavis, supra. The fact is, however, that minority members have run for office and have on occasion won. Ms. Joan Irving, a Black, currently serves on the Lubbock County School Board. In 1972, plaintiffs' witness, Froy Salinas, a Mexican-American, ran for the School Board, and in a four man race, came within 250 votes of the winner. In 1968, Ms. Paulina Jacovo, a Mexican-American, ran for County Commissioner and lost. Much is made by plaintiffs of her defeat. In their view, her loss was primarily the result of a racist feeling within her precinct. A closer analysis of the election reveals, however, that a more appropriate description of Ms. Jacovo's defeat would be urban versus rural rather than Mexican-American versus Anglo. Indeed, some Mexican-Americans outside of Ms. Jacovo's urban residence actively campaigned against her (Sowder deposition, pages 20, 21). Ms. Jacovo's major obstacle, it seems, was that she was an urbanite running for an office traditionally held by a member of the rural community.

It is also uncontested that there is no slating process in the choosing of candidates for public office in Lubbock County. The Legislative race at the primary level was described by the immediate past Chairman of the Democratic Party, Madison Sowder (1969–1973), as a "free-for-all" (Sowder Deposition).

The evidence shows further that the voting records of delegates from District 75 support a finding that these delegates have generally voted for issues presented to them along the same lines as Mexican-American and Black legislators. In short, the evidence shows that District 75 legislators have been sensitive, rather than callous, to the particularized political needs of their minority constituents.

It is admitted and uncontested by this dissent that there have been incidences of racial discrimination in Lubbock County in the past on the social and public facilities plane, but no evidence has been adduced which would support a finding that the existing multimember district is operated to deny the minority effective access to the political process.

Once again, the only evidence in the record on this point is the uncorroborated opinion of plaintiffs' witness, Dr. Cotrell, to the effect that he feels, after a whirlwind tour of two days and the analysis of some voting statistics, that the minority is just not doing as well as it should. Such testimony, in the absence of corroborative evidence, falls far short of carrying plaintiffs' burden to support their challenge to the District 75 multimember district.

## DISTRICT 72: EL PASO COUNTY

The plaintiffs would have this Court draw the parallel between El Paso and Bexar Counties as concerns demographic and cultural patterns yielding similar political results. Employing analogy as their cornerstone, plaintiffs maintain that El Paso, like Bexar, is composed of a Mexican-American majority of 56.-87%. Plaintiffs have attempted to show

a heavy concentration of Chicanos in what is known as the South Side of El Paso who have been deprived of political access by virtue of the language barrier, economics, past discriminatory practices and political repression in the form of the now defunct Poll Tax. Plaintiffs' expert, Dr. Charles Cotrell, spent all of two days and an extensive taxi tour of the City before reaching these profound, but wholly unsupported conclusions. Dr. Cotrell further testified that voting patterns were similar to Bexar County in that the average voter turn-out in El Paso was 30% Mexican-American and 60% Anglo in an effort to prove that the "numerically smaller Anglo population still controls through the legal device of the multimember district". (TR. p. 605) The plaintiffs also presented the elected Chairmen of the Democratic and Republican Parties to substantiate Dr. Cotrell's ultimate findings. Both witnesses testified that campaign expenditures for a State legislative seat amount to $15,000–$20,000 in the present multimember district. Although no witness testified that minority candidates had been unable to raise such amounts, the political Chairman opined that single member districts would lower campaign costs and encourage more Mexican-American candidates.[4] They further testified that although there was no overt racial campaigning conducted in El Paso, nor was there any slating in State House races, there was, however, a nebulous sort of "whisper campaign" conducted in the Anglo community and some business groups that helped finance and endorse candidates. An objective appraisal of this evidence hardly presents the mental image of the smoke filled room of political bossism of which the DCRG in Dallas was accused or of the invidious type of political/racial discrimination found by the Fifth Circuit in Ouachita Parish, Louisiana. (See *Turner*, supra)

The only Mexican-American to testify from El Paso County was David Morales on behalf of the State. Morales, who has been active in political campaigns for several years, testified that "We (Chicanos) have been active in running and we've been successful in taking some of the offices." (TR. p. 419) He further concluded that though there had been some past acts of racial discrimination, the Mexican-American community has been able to overcome this to the extent that they are not prohibited from taking an active political role. As opposed to plaintiffs' witnesses, Morales stated he favored the present multimember district plan fearful that single member districts would serve to both polarize and disenfranchise the Chicano vote and virtually destroy their political effectiveness or voting strength. Where it is now conceivable and very possible for the Mexican-American community to carry every county-wide elective office, single member districts would almost certainly dilute this political opportunity.

Also testifying for the State of Texas was Sen. Frank Owen who had served as a State Representative from El Paso from 1950–1954 and later as State Senator until 1965. The former Senator stated that he could never have been elected to political office nor remained there without substantial Chicano support. Given the demographic make-up of the County, Owen stated that it would be impossible for any candidate, past, present or future, to successfully run without a goodly portion of the Mexican-American vote. Like Mr. Morales, Senator Owen favors the present plan in effect in El Paso, again fearing polarization of the races and the creation of Ward heeler politics. While there are no slating groups for statewide races nor powerful political cliques in El Paso, the witness testified there were many Mexican-American attorneys and profes-

4. In District 72 (El Paso) the four successful Candidates spent amounts ranging from $17,000 to $3,000, indicating that Campaign costs vary so much even within a given multimember district as to be an unreliable barometer of constitutionality.

sionals who were politically active and provided leadership in that community. It is perhaps most interesting and compelling to note that Mr. Owen lost his recent bid for a State Senate seat to a Mexican-American named Santiestaban who won over three Anglo candidates and one Chicano.

Throughout this case, the application of the *Whitcomb* test to determine the constitutional issues has been a difficult task indeed. To find "access (or lack thereof) to the political process" where there has been no actual political victory at the polls is much akin to divining how many angels can stand on the head of a pin. In El Paso County, however, the task is not so intricate nor the proof so elusive. Without question, political participation by minorities at all levels of government is both active and effective.

As concerns the attempted analogy between El Paso and Bexar Counties by plaintiffs, it should first be noted that there is an apparent and significant population disparity. Bexar County is approximately 830,000, whereas the El Paso multimember district contains only about 290,000. The Supreme Court in *Whitcomb*, supra, specifically stated that multimember districts may be subject to challenge where circumstances show minimizing or cancelling out of voting strength and that such districts are especially justiciable ". . . when the district is *large* and elects a *substantial portion* of the seats in either house of a bicameral legislature . . ." (Emphasis added) Surely, it can be conceded that El Paso County alone (pop. 347,000) does not even have sufficient population to warrant a Senate seat, but must share a Senator with several surrounding counties. Furthermore, the multimember district at issue does not encompass the entire County and is only large enough to require four State Representatives. Obviously, this is not the populous kind of district nor the legislatively powerful delegation contemplated by the Supreme Court as suspect under *Whitcomb*, supra.

The testimony by the expert witness and others as regards the disadvantaged South Side of El Paso is hardly the fact filled type of evidence originally presented to this Court on Bexar County which was replete with Civil Rights studies and reports on specific income tabulations, living conditions, educational achievements ad infinitum to provide a complete picture of the Barrio area. Simply to say that there is a concentration of Chicanos in one area of the City combined with the unsubstantiated and subjective statements that they are disadvantaged should not be the sort of compelling proof for this Court to draw the parallel to the San Antonio Barrio. Arguendo, even if all these generalizations are taken as true, the absolute statistics indicate political access to the governing process as shown below in the following paragraph.

In 1960, El Paso elected its first Mexican-American Mayor, Raymond Telles. Four years ago, there were three Mexican-Americans elected from El Paso to the State Legislature. At present, Senator Santiestaban represents El Paso in the Texas Senate after a hotly contested election between three Anglos and one other Mexican-American candidate. Parenthetically, the Anglo candidates did not even carry the Anglo community. Two County Commissioners currently in office are Mexican-American and have so held their posts since 1962. There are also two Mexican-Americans presently on the El Paso City Council who won office in City-wide elections. As if this were not proof enough, it should be noted that El Paso Mexican-Americans now occupy the following elective offices in the designated numbers: Two District Court Judges, three Justices of the Peace, Three Constables, one Domestic Relations Court Judge, one County Court at Law Judge and one Corporation Court Judge.

It is inconceivable how the majority of this Court can successfully ignore or circumnavigate the cold, hard, undisputed statistical evidence so overwhelming in El Paso County to arrive at the conclu-

sion requiring single member districts. Whatever racial discrimination may have been prevalent in the past, the great weight of statistics alone would show it persists only as an inaudible whisper at the cocktail parties of a few politically frustrated bigots which is no evidence of probative force to establish that the multimember district is unconstitutional. There is simply no compelling or other solid evidence in El Paso that past discrimination has a "continuing effect . . . on the minority group's ability to participate in the political process". Turner v. McKeithen, 490 F.2d 191 (Fifth Cir., 1973, No. 71-2221)

Furthermore, even the plaintiffs' expert, Dr. Cotrell, testified that El Paso did not pursue a "slate-making" type of politics on the State level as in Dallas and Bexar Counties. There was no evidence whatever of any existing politically domineering endorsement group which strives to eliminate or discourage minority candidates or prevent them from participating in the candidate selection process.

There is also absolutely no evidence in the record tending to show that the elected officials of El Paso are unresponsive to the particular concerns of the minority group. Indeed the opposite appears to be the case. What with a plethora of Chicano elected officials at every governmental level, a claim of "tokenism" evinces the grossest naiveté.

I must concur with the opinions expressed by the witnesses, Morales and Owen, that a redistricting of El Paso County may only serve to frustrate what is a politically viable majority—the Mexican-American vote. Certainly the single member district concept is a two edged sword and one which could sever, segregate and polarize a numerical majority into a district that would provide less representation than now possible in a county-wide election. Where there is no evidence of present racial discrimination or the lingering effects of past discrimination plus abundant proof of effective access to the political process, it must be inevitably concluded that an ethnic group representing 58% of the population is and has exhibited the ability to be the political catalyst of El Paso, Texas.

Other than the broadest of hearsay generalities and subjective opinion heard by this Court in favor of single member districts in El Paso, there is simply no factual evidence of a constitutional violation or dilution of the minority voting strength which would necessitate Federal Court intervention and reapportionment and I stand in respectful, but firm, opposition to the majority opinion of this Court on the matter of El Paso County.

DISTRICT 48: NUECES COUNTY

The next stop on our expedition is District 48 encompassing the major portion of Nueces County. This multimember district has an approximate population of 220,000 electing a three man legislative delegation. It is currently served by Representatives DeWitt Hale (Anglo), Carlos Truan (Mexican-American) and Joe Salem (Lebanese—a member of the "other" group in demographic terminology).

Dr. Cotrell's taxi tour of Texas allowed him three days in the fair coastal city of Corpus Christi and Nueces County.

One thing should be clarified at the outset. Plaintiffs' witness, Dr. Chas. Cotrell, and their witness, Representative Carlos Truan of Nueces County, as well as others, are philosophically opposed to multimember districts as a method of representation. As has been said in White v. Register et al., supra, however, multimember districts, even when used in conjunction and combination with single member districts in a legislative apportionment plan are *not* unconstitutional per se.

Plaintiffs' expert, Dr. Cotrell, makes the clear and contradictory assertion that on the one hand the fact that no Black has been elected to the Legislature from Galveston County is of little or no

significance because the Blacks in Galveston County have been adequately represented by the legislators who have been elected; on the other hand, Dr. Cotrell asserts that the fact that few Mexican-Americans have been elected from a County such as Nueces is and should be an important consideration tending to support his conclusion that the existing multimember district has and does operate to deny this minority effective access to the political process. This conclusion is made in the face of the clear and undisputed fact that for eight of the last ten years one-third of the legislative delegation from Nueces County has been, as it is now, composed of a Mexican-American Representative who is serving his third consecutive term. (Plaintiffs' witness, Representative Carlos Truan; Hale—Anglo; and Salem—Lebanese)

The testimony of plaintiffs' witnesses and of defendants' witness, Representative DeWitt Hale, is unanimous in expressing the observation that while there may have been some discrimination in Nueces County in the past any current racial polarization that may exist is in large part due to the Fifth Circuit's decision in Cisneros v. Corpus Christi Independent School District, 324 F.Supp. 599 (S.D., Tex.1970), affirmed in part, modified in part and remanded, 467 F.2d 142 (5th Cir., 1972). Plaintiffs' expert witness, Dr. Cotrell, personally considers an antagonistic feeling towards forced busing to be a racially identifiable attitude evincing a generally discriminatory feeling in the Anglo community toward minority groups. This blanket indictment overlooks extensive recent nationwide polls indicating that forced busing as a means of achieving a racially balanced school system is generally unpopular with *all* segments of our society—*no one* seems to like or want it. (See also Transcript at page 731)

Much is made of *opinions* by plaintiffs' witnesses that there remain residual effects from past discrimination; that minority voters are yet unused to being able to vote because of a hangover from the poll tax (abolished in Texas in 1966); and that minorities, because of the cumulative effects of an historical pattern of discrimination, feel ineffective and frustrated and are, therefore, denied effective access to the political process. In outlining his opinion on this point, plaintiffs' expert witness, Dr. Cotrell, reasoned that had minorities in the past been successful in their efforts to elect or seriously influence the election of public office holders and had, for some reason, been unsuccessful in the last ten years, then such situation would obviously signal a rise in the effects of discrimination. In Dr. Cotrell's opinion, such evidence would clearly show the need for change to single member districts.

The situation in Nueces County is quite the converse, however. The undisputed evidence clearly outlines the marked success and political potency of the Mexican-American in Nueces County in the last ten years. As previously noted, one-third of the multimember legislative delegation has been Mexican-American for eight of the last ten years. Further, at the present time *three* of a six member City Council, elected at large in the major city, Corpus Christi, are Mexican-American; *one* is a Black and *two* are Anglo with an Anglo Mayor. Other at-large elections have produced the following current situation: District Clerk, Oscar Solis, defeated an incumbent Anglo (Transcript, page 730); County Court at Law Judges Margarito Garza (who defeated an Anglo for the post; Transcript, page 544—testimony of Representative Carlos Truan), and Hector Pena (the only two such positions in the County); County Commissioner Solmon Ortiz (one of four single member districts in the County); Justices of the Peace Armando Flores, Manuel Cantu and Jose Lopes; and one Mexican-American Constable (testimony of State Representative Carlos Truan, Transcript, page 544).

In spite of these overwhelming *facts*, Dr. Cotrell expresses the *opinion* that such recent conditions of the last ten years should count for naught. Rather,

the "historical discrimination" preceding this period of obvious political potency should be the controlling consideration in reaching his conclusion that the Mexican-American minority in Nueces County is denied effective access to the political process.

In addition to the clear evidence of political effectiveness currently displayed by the minority population of Nueces County, the evidence is also clear that the particularized needs of these groups have been not only adequately but admirably advanced in the Legislature for some twenty years by Representative Hale and, as indicated, he has more recently been joined in his efforts in the last ten years by Representatives Bonilla (1964) and Truan (1968 to date). (See the testimony of Representative Hale, Transcript, pages 725, et seq., and Representative Truan, Transcript, page 519, et seq.) Indeed, Representative Hale has been such a paragon of the pioneering progressive in advancing legislation vital to the particularized needs of his longtime Mexican-American constituency that the League of United Latin American Citizens (LULAC) made him an honorary member for his efforts. Today, Representative Hale carries the Mexican-American areas by larger margins than the Anglo areas.

Dr. Cotrell's opinion that Representative Truan, having won by a lesser margin of victory in 1972 than in 1970 or 1968, no doubt suffering from the slings and arrows of outrageous racial polarization and discrimination, lacks probative weight. (Transcript, pages 668, et seq.) This Court feels secure in taking judicial knowledge of the heavy influence of the Roman Catholic Church in the Corpus Christi area. An important factor left out of Dr. Cotrell's unsupported conclusions is that Representative Truan had a rather serious "falling out with the Bishop of Corpus Christi" in 1972. He was, in fact, publicly criticized rather severely by the Bishop.[5] (Transcript, page 736) Further, due to legislative redistricting in 1972, all members of this multimember district lost the northern and western part of Nueces County and all of Kleberg County. Representative Truan, while living in and representing Nueces County, grew up in Kleberg County and understandably had carried it almost unanimously (Mexican-American, Anglo and Black voters) in previous elections. (Transcript, page 735) Further, Dr. Cotrell's opinion, following his three day tour, that the clear early signs of the heartbreak of polarity exists in Nueces County is diametrically opposed by Representative Hale whose occupation over the last twenty years has been running for political office in Nueces County (Transcript, pages 729–730)

The issue of slate-making tactics, as a method of discriminatory control (as in the Dallas case) by the majority (the Anglo community) is clearly *not* a part of the case in Nueces County. The only evidence of any slate-making attempt at any level is the testimony of Dr. Cotrell that there were two slates for City Council in Corpus Christi in the 1971 election. Given the current composition of the Council (as previously noted) it can be assumed that the role of slate-making has been minor, if not non-existent, as regards any attempt at discriminatory control by the Anglo community. In the opinion of defendants' witness, Travis Peeler (deposition), Nueces County Democratic Executive Committee Chairman, there is no slating in Nueces County. As regards the State Legislative level, he is joined in this opinion by plaintiffs' expert, Dr. Cotrell:

> ". . . I don't think we could describe Nueces and El Paso as a so-called slate-making state legislative level." (Transcript, page 645)

In conclusion, the only thing plaintiffs have succeeded in showing by a preponderance of the evidence is that if racial polarization does exist and if such polarization to any degree denies effective access to the political process by the Mexican-American (and Black) minority (such contention being contrary to the

5. The exact phraseology was: "The Bishop was jumping all over Mr. Traun down there . . ."

overwhelming weight and preponderance of the factual evidence), such racial polarization, rather than being the product of a long history and current condition of racial discrimination, is the immediate, recent and direct result of the Fifth Circuit's decision in the *Cisneros* school opinion, supra. (See depositions and transcript testimony of Travis Peeler, Apolonco Montemayor, Representative Carlos Truan and Representative DeWitt Hale.)

DISTRICTS 17 AND 19: GALVESTON COUNTY

The challenge to Galveston County is limited to an attack on the recent redistricting which took Census Tract 1219 from District 19 and placed it into District 17. Plaintiffs allege the change was made because of Tract 1219's heavy concentration of Blacks in an affirmative effort to dilute and minimize their voting strength in violation of the Fourteenth Amendment. See Gomillion v. Lightfoot, 364 U.S. 399, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). It is conceded by plaintiffs' counsel, Mr. Richards, and by plaintiffs' expert, Dr. Charles Cotrell, that there is no evidence that multimember districts as used in Galveston operate to deny minorities effective access to the political process. (Trial Transcript, pp. 626 and 666) What this Court is concerned with in Galveston County then is a claim of racially motivated gerrymandering.

The paramount inquiry in this regard is the motivation of the Legislative Redistricting Board in taking Tract 1219 from District 19 and placing it into District 17.

As the majority opinion points out, the 1970 census revealed that the previous two-member multimember district contained approximately 20,000 population in excess of the ideal two-member district. Faced with this fact, the Board had no alternative but to correct the imbalance through a redistricting. The plan adopted placed Census Tract 1219 into District 17. It is this action which plaintiffs claim to have been racially motivated.

The evidence presented on this point is indeed concise. It consists of the uncorroborated opinion of Representative Ed Harris of District 19 (Trial Transcript, page 240). In his opinion, the intent of the Board was to influence the outcome of the legislative races in District 19 encompassing the major portion of Galveston County. The plan adopted by the Board, while excising Tract 1219's approximately 5,500 Blacks (total population in Tract 1219 is 8,575 by 1970 Census), leaves untouched the remaining 28,000 Black population of Galveston County. Further, a cursory glance at the 1970 Census Tract map for Districts 17 and 19 reveals the monumental task faced by the Board in their efforts to conform to the "one man, one vote" mandates of the Constitution. The area includes mainland, peninsula and island land masses in the meandering fashion of nature.

The bare opinion of Representative Harris in light of the extreme geographical obstacles of nature faced by the Board in its efforts belies the efficacy of a rush to judgment. Much more must be shown by plaintiffs to support their challenge to the good faith efforts of the Legislative Redistricting Board. The dearth of evidence presented does not overcome the presumption of the constitutionality of the Board's action and compel change.

CONCLUSION

"From the beginning, we have recognized that 'reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.' (citing cases) We have adhered to the view that state legislators have 'primary jurisdiction' over legislative reapportionment." White v. Weiser (1973), 412 U.S. 783, at pages 794, 795, 93 S.Ct. 2348, at page 2354, 37 L.Ed.2d 335.

This language is a virtual summation of the attitude of the Supreme Court in most all of the reapportionment suits ever to come before that esteemed body. It stands as a warning and directive at the threshold of the political jungle admonishing lower Courts to be wary and surefooted before attempting intrusion into the sovereign state forest of political activity.

Having thoroughly examined the evidence presented for each County, it is inconceivable that Federal judicial intervention is required in those Counties at issue. There is absolutely no preponderating evidence in this record to establish that in any of the nine Counties involved that a single member district would afford Blacks, Browns and Republicans, the parties to this case, greater access to the political process than the present multimember districts.

The only evidence in this case of any real probative force is that in certain multimember districts (1) Blacks, Browns and Republicans have not been elected in some of the districts; or (2) members of these groups have not been elected in other districts in direct proportion to their population. These are improper considerations under *Whitcomb* and overlook the undisputed evidence that in certain cities and counties of multimember districts these groups have in the past and still do elect at large officeholders. Certainly there is no evidence in any of these that there has been a diminution or cancellation of the rights of these groups to participate in the political process.

As *Whitcomb*, 403 U.S. at pages 156, 157, 91 S.Ct. at page 1876 has warned us, if judicial remedy were provided for political failure such as this, it would be difficult to reject claims of any political organization or identifiable interest groups and "would spawn endless litigation concerning the multi-member district systems now widely employed in this country."

The Supreme Court in this very case and in Whitcomb v. Chavis held that, absent "purposeful" racial discrimination, minority groups have no right to be assured or guaranteed that they can or will elect any officials. Further, such evidence is of no value to establish the contention of plaintiffs that the division of these nine multimember districts into single member districts would be the panacea for all of the complaints or would even tend to improve the alleged discrimination. This is true even assuming that the State of Texas had an improper design and motive to minimize, cancel out and dilute the rights of these minority groups in political affairs which the evidence in this case utterly fails to support.

The Supreme Court in *White*, supra, acknowledged that this Court had "its own special vantage point" and had made an "intensely local appraisal" of the political situation in Bexar and Dallas Counties. Those same plaudits cannot be cast in the case at Bar. Plaintiffs' argument and proof was based primarily on a subjective appraisal and a most cursory study of the Counties involved with the apparent motive of having this Court, rather than the legislature, gerrymander in reverse to specifically promote and elect politically acceptable representatives. The ultimate conclusions reached by the members of the majority of this Panel, to my mind, ignore or misinterpret the guidelines spelled out in the several treatises handed down by the Supreme Court in previous reapportionment litigation, and discard much of the factual evidence in favor of "expert opinion" in their valiant efforts to crush the cause and effect of an allegedly infirm and discriminatory political process. It cannot be denied that the legislative reapportionment type of civil rights case is an emotionally charged suit in which competing political philosophies and methods often clash unrestrained and electrify charges of racial or other ethnic discrimination. This is an area into which the Federal Judiciary must, indeed, proceed with extreme caution. For, while emotion may preponderate clearly in favor of a plaintiff's challenge, the importance of a *factual* showing to support that challenge by a preponderance of the evidence can-

not and must not be sidestepped or overlooked.

The remedy of imposing Court drawn single member districts is the most radical that equity could require and is one which should be imposed only after setting aside on supportable grounds other alternatives found inadequate. Whitcomb v. Chavis, supra, 403 U.S. at page 160, 91 S.Ct. 1858.

The majority, however, having found unconstitutional the challenged multimember legislative districts and having found an unconstitutional gerrymandering in Galveston County, takes up its compass and marches myoptically and irrevocably towards the remedy of Court imposed single member districts by passing without thought such recommended alternatives as are mentioned by the Supreme Court in *Whitcomb*. Indeed, the only evidence before this Court on the question is that much less radical and disruptive corrective surgery would be a more than adequate cure.

There is uncontroverted testimony that adoption of an all single member plan would in many districts operate only to submerge the political effectiveness now enjoyed by minorities. The evidence further shows that in certain of the districts plans submitted to this Court by some plaintiffs are attacked as being unconstitutional by other plaintiffs. Such disagreement illustrates the lack of proof presented that any one single member district plan offers a better remedy than another or than any of the other alternative remedies available for this Court's consideration.

The Supreme Court has repeatedly admonished that District Courts ". . . should not pre-empt the legislative task nor 'intrude upon state policy more than necessary. . . .'" White v. Weiser, supra, 412 U.S. at page 795, 93 S.Ct. at page 2355. Further, as I have noted above in this dissent, it is only when the legislature fails to act to remedy a constitutionally impermissible condition that judicial relief becomes appropriate. Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). See also White v. Weiser, supra, 412 U.S. at pages 794–795, 93 S.Ct. 2348.

The initial attack on the herein challenged multimember districts was discarded by the Supreme Court as inadequate. See White v. Register, supra. The Texas State Legislature was, therefore, not under any judicial pressure to strike down these remaining districts in favor of an all single-member district legislative plan.[6] In fact, an attorney for plaintiffs admitted that the smaller, less populous multimember districts (now challenged in the case at Bar) did not present the same degree of constitutional infirmity nor applicability under the *Whitcomb* tests as Dallas and Bexar Counties in these words:

> "Yes, we do have some multimember districts with two or three representatives. Perhaps we may not have yet reached the point population-wise in those particular districts to think about giving them single member districts. I certainly don't want to advocate that at this point, but I think I recognize what the Court has in mind when he raises this question, but, certainly, regardless of what we may conclude as to these two or three multimember district counties, I believe that the same thing does not apply to one that has 11 representatives, as Bexar County, and another one that has 18, as Dallas County."

I, therefore, reiterate the thoughts expressed in my original dissent that this Court should exercise as much judicial restraint as possible in declaring the challenged districts unconstitutional. However, where, as here, the majority of this Court has deemed it necessary, the Legislature should have every opportunity to correct its alleged mistakes. I firmly believe that such is the approach mandated by the Supreme Court.

Such approach carries special emphasis where, as in this case, the various

6. Since the State has not in any manner acted in bad faith or been under any mandate to reapportion its legislative districts, I cannot conceive nor condone a granting of attorney's fees to plaintiffs regardless of the final outcome of this case.

competing plans proposed by the plaintiffs represent a clear and open attempt to obviate the Supreme Court's requirement that the District Court be "color blind" in fashioning a remedy. Indeed, (based upon various political and color conscious considerations) plaintiffs have found some difficulty in agreeing on satisfactory plans. There is, on the other hand, ample evidence that, but for procedural failings, some of the delegations from the now challenged districts could have succeeded in having the previous legislative session adopt single member plans for their districts. In the light of such activity, it must be conceded that given a mandate by the judiciary to do so, the Legislature would accept the task and fashion the constitutional remedy required.[7] There is no basis in reason or in the evidence presented to reach a contrary conclusion.

Pursuant to this Court's request, the State of Texas submitted plans for its consideration. The plan for Tarrant County was recommended and approved by its present legislative delegation—seven supporting the plan, one against it and one undecided. The delegations from the following Counties were unanimous in their support of the State offered plans: Jefferson, Lubbock and McLennan. The three member delegation from Nueces County split two for and one against and the State submitted for the Court's consideration the plan approved by the majority. The State also submitted a plan proposed by the Mexican-American plaintiffs and approved by the dissenting Representative Carlos Truan.

The approval of these plans by the representatives from each district is a clear expression of legislative intent. Assuming even that the Supreme Court affirms the holding of the majority that these multimember districts are unconstitutional, legislative courtesy would require the adoption of these single member district plans and is thus the equivalent of legislative intent.

The majority of this Court arbitrarily and without stating their reasons totally ignored all of these plans even though they were also approved and endorsed by the party defendant, Honorable Dolph Briscoe, the democratically elected Governor of the State of Texas. In this connection, it should be noted that in comparison to the plans submitted by the legislative delegations those submitted by the plaintiffs and adopted by this Court constitute an unabashed gerrymandering in reverse to insure the election of the plaintiff ethnic groups to the exclusion of all others.

The majority disregards White v. Weiser, supra, *Whitcomb*, supra, and all the other Supreme Court cases which compel deference to the State performance of this purely "legislative" function, and orders immediate imposition of specific single member plans in seven of the challenged districts. Yet, for reasons either totally illogical or unexplained, the State is permitted by this Court to have its normal, constitutionally reserved prerogative of legislatively redistricting Galveston County. Again, the reasons for this obvious discrimination against the other seven districts is not susceptible to satisfactory illumination or support. It clearly follows that if there is no urgency for the Court to redistrict Galveston County, there likewise is no urgency for the Court to assume this purely unauthorized legislative function for the other Counties.

There must surely be a level of "preference" which falls short of "prejudice" that will forever affect the relative chances of candidates, whether they be Black, Brown, Oriental, Arabic, Democratic, Republican, La Raza Unida, John Birch Society, male, female, Catholic, Protestant, Jew, young, old, handsome, homely or other. It seems unlikely that our society and the laws of human na-

7. The Texas Constitutional Convention is currently in session considering a complete revision of the State's voluminous constitution. One of the items specifically before it is a recommendation by the Constitutional Revision Commission that the State, in its revised constitution, adopt statewide an all single-member legislative plan.

ture will ever reach a point of total blindness to differences in color, ethnic background, affluence, poverty, political and religious affiliation, sex, age, or a variety of other human and emotional considerations. Those persons who fall into a particular category of this type and who comprise less than 50% of the electorate of a given district can never be assured of the absolute ability to elect one of their own to represent them in legislative halls or in any other multi-member governmental body. This is not a fact that can be changed by a judicial decree eliminating multimember districts or by substituting single member districts with lines arbitrarily drawn by uninitiated life tenured Federal Judges. The Courts and Legislature simply cannot change or repeal the inherent laws of human nature. Rather, as the Supreme Court has reasoned, our only task and ultimate goal is to provide all the body politic with effective access to the political process. I submit that in Texas, as the districts now exist, voters have attained the goal and it is time for the surrogate Federal Court to step aside and let Democracy run its course.